No. 110,224

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

Kirk T. Wilson,
*Appellee/Cross-appellant*,

v.

State of Kansas,
*Appellant/Cross-appellee.*

SYLLABUS BY THE COURT

1.

When a defendant seeks to set aside the result of a criminal trial on the ground that his or her defense counsel provided ineffective assistance, the defendant has the burden to show (1) that the attorney's work was below minimum standards and, thus, was constitutionally deficient; and (2) that the attorney's substandard work prejudiced the defense.

2.

In determining whether the attorney's substandard work prejudiced the defense, the court must consider the cumulative effect of the attorney's work that was below minimum standards.

3.

The district court does not abuse its discretion by allowing expert testimony regarding the effectiveness of trial counsel and its effect on the trial.

4.

On the facts of this case, the defendant demonstrated that his trial attorney's representation was below minimum standards and that this prejudiced the defense. Accordingly, the defendant is entitled to a new trial.

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed December 5, 2014. Affirmed.

*Kristafer R. Ailslieger*, deputy solicitor general, for appellant/cross-appellee.

*David E. Everson*, pro hac vice, *Victoria L. Smith*, and *Patrick A. Edwards*, of Stinson Leonard Street LLP, of Wichita, for appellee/cross-appellant.

Before LEBEN, P.J., PIERRON and STEGALL, JJ.

LEBEN, J.: Kirk Wilson was convicted of the murder of Kurt Boldridge based in part on the testimony of John Goodpasture, who said he witnessed the murder. But the district court later set aside Wilson's conviction and ordered a new trial after it concluded that his trial attorney had provided representation below constitutionally required minimum standards.

The State has appealed, but the facts found by the district court after 2 days of evidence support its conclusion that Wilson's attorney provided inadequate representation. Among the key failings:

- Goodpasture said the murder took place on a Saturday night, but at least five people told police that either they or someone they knew had seen or spoken to Boldridge afterward, including two witnesses who saw him on Monday. Wilson's attorney did not present that evidence to the jury.
- Goodpasture made highly inconsistent statements to law-enforcement officers about the murder. Although Wilson's attorney did cross-examine Goodpasture

about some inconsistencies, the attorney left many very significant ones unexplored.

- Goodpasture had written letters that contradicted his statements to police. Wilson's attorney did not present the letters to the jury.
- Police recorded conversations involving Wilson and another person without Wilson's knowledge, and Wilson's comments during those conversations suggested he was not involved in the murder and did not even recognize a person Goodpasture said had also been present with Wilson at the murder. Wilson's attorney did not present those tape recordings to the jury.

The district court concluded that there was no reasonable strategic reason to fail to present the noted evidence or to more thoroughly cross-examine Goodpasture, the only claimed eyewitness who testified. We agree that by not offering this evidence or more thoroughly cross-examining Goodpasture, Wilson's attorney must have either failed to familiarize himself with the evidence in the case or used an objectively unreasonable trial strategy. See *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 33, 287 P.3d 855 (2012). We also agree with the district court that this worked to Wilson's substantial detriment, *i.e.*, there is a reasonable probability that the trial's outcome would have been different had Wilson's attorney provided minimally effective representation. We therefore affirm the district court's judgment, which requires that Wilson receive a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

The claims before us are intimately tied to the facts of both the underlying prosecution of Wilson and the actions of his trial attorney in defending him. Accordingly, we must set out the facts in substantial detail.

Wilson was convicted in 2001 of premeditated first-degree murder. On the initial, direct appeal from a conviction, the appellate court must look at the evidence in the light

3

most favorable to the State, since the factfinder (in Wilson's case, a jury) has found in the State's favor. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). Applying that standard in Wilson's direct appeal, the Kansas Supreme Court summarized the facts in the light most favorable to the State:

"Kirk Wilson was convicted of the premeditated first-degree murder of Kurt Boldridge. Wilson and Boldridge had both been married to the same woman, Sandra White. Wilson was married to Sandra first. Before divorcing in 1991, Wilson and Sandra had a son named Matt. Sandra was married to Boldridge from October 1998 to October 1999, a time in which Wilson was incarcerated. Wilson's son Matt lived with Sandra and Boldridge during their marriage. Wilson was released from prison on March 13, 2000.

"On March 24, 2000, Boldridge's mother contacted the Atchison County sheriff's office and requested that they check on Boldridge's welfare because she had not seen or heard from him in nearly a week. When officers reached Boldridge's house they could smell the decay of a dead body from outside the house. The house was secure, and there was no evidence of forced entry. Because all of the windows were locked, sheriff's deputies had to break part of the glass from a window to enter the house.

"Deputies discovered Boldridge's body on the bed with a comforter completely covering him. The body was decayed enough that the coroner could not immediately determine the cause of death at the scene, so he ordered an autopsy. Besides Boldridge's dead body, nothing else in the house appeared out of place. Nothing appeared to be missing, and there was no evidence of a fight or a struggle.

"An autopsy established that Boldridge died from a shotgun blast to his left temple. There was wadding from the shotgun shell inside Boldridge's head, indicating that he had been shot at close range. There were no other injuries on his body. Insect larvae in Boldridge's body indicated that he had been dead for at least 3 days and possibly longer.

"News of the gruesome discovery leaked out quickly. Wilson's current wife Kim heard about Boldridge's death within hours of the discovery of his body and telephoned

4

her sister to inform her of Boldridge's death and advise her that she thought Wilson was involved. Kim's sister immediately contacted the Atchison police to report Kim's statements.

"The investigator for the sheriff's department interviewed Wilson on March 28, 2000. Wilson denied any involvement in Boldridge's death, but stated that he heard about it on the weekend of March 18, 2000, 6 days before Boldridge's body was discovered.

"In August 2000, Kim called police because Wilson had beaten her. Kim reported that while he was attacking her, Wilson stated that he had killed Boldridge and they were coming to arrest him for that, so he might as well kill her too.

"John Goodpasture was sleeping on the Wilsons' couch while Wilson was beating Kim. After beating Kim, Wilson attacked Goodpasture and began beating him. Wilson drug Goodpasture into the bedroom and accused him of having an affair with Kim. During the fight, Wilson told Goodpasture, 'if you think what happened to that nigger was bad, wait until you see what happens to you, and Gary [Skeen] [is] going to get it twice as bad.' Fearing for his life, Goodpasture jumped through the glass in the bedroom window to escape from Wilson's fury.

"Soon after Wilson beat Goodpasture, Goodpasture started talking to police about Wilson's involvement in Boldridge's death. According to Goodpasture's story, Goodpasture and his friend Gary Skeen were at their friend Harold Gillis' house when Wilson arrived at approximately 1 a.m. on March 19, 2000. Wilson was very upset, proclaiming that Boldridge had made Wilson's son Matt perform oral sex on Boldridge. Goodpasture stated that Boldridge's current wife Lisa had informed Wilson about the alleged abuse of Wilson's son. Wilson was so upset that he said he was going to kill Boldridge and showed Goodpasture a gun that was tucked in his pants. Lisa Boldridge arrived at the Gillis' house after Wilson and encouraged Goodpasture to participate in killing Boldridge by telling him that Boldridge had cocaine and Goodpasture could have it in return for his participation.

"Wilson, Goodpasture, Gary Skeen, and Lisa Boldridge left Gillis' house and drove to Boldridge's house. When they arrived, Lisa Boldridge let the other three into the

5

house and led them to the bedroom, where Boldridge was sleeping. Lisa got a shotgun and some shells and gave them to Wilson. Wilson approached Boldridge as he lay sleeping and shot him. Afterwards, Goodpasture and Skeen looked briefly for the cocaine but decided to leave before finding anything.

"Wilson, Skeen, and Goodpasture left in one car and drove to the Atchison park on the Missouri River. Lisa Boldridge left in another car and met the others at the park. Wilson threw the shotgun into the Missouri River. Although Goodpasture told law enforcement several different versions of the story and admitted that he lied to law enforcement several times, he insisted that his story implicating Wilson as the shooter was truthful.

"The State filed a complaint/information charging Wilson with first-degree premeditated murder in December 2000. At trial, the State relied on testimony from Kim and Goodpasture to establish Wilson's involvement in Boldridge's death. In addition to testifying that Wilson admitted to killing Boldridge, Kim testified that Wilson began checking the newspaper for articles about Boldridge's death before Boldridge's body was discovered.

"To impeach Goodpasture's testimony, Wilson elicited evidence that Goodpasture had entered into a plea agreement allowing him to plead guilty to a severity level 7 felony with a sentence of probation in return for his testimony against Wilson. Goodpasture testified that he would do almost anything to avoid going to prison for murder. Wilson also impeached Goodpasture with the various stories and lies he told to law enforcement. In response, Goodpasture testified that he lied until he knew he had to pass a polygraph test.

". . . The district court sentenced Wilson to life in prison with no possibility of parole for 25 years." *State v. Wilson*, 281 Kan. 277, 278-80, 130 P.3d 48 (2006).

The Kansas Supreme Court affirmed Wilson's conviction.

In 2007, Wilson filed a motion for habeas relief under K.S.A. 60-1507, claiming that his trial counsel, Michael Waite, had been ineffective. The petition said that Waite had failed to introduce material evidence and had failed to offer police reports and witnesses to impeach State witnesses' testimony. Waite was indefinitely suspended from the practice of law in Kansas in 2007 for misuse of another client's money. Waite died in 2008 and thus was not available to testify at Wilson's habeas hearing.

Wilson sought leave in 2011 and 2012 to amend his habeas claim. The district court denied his request to add two claims—that Waite had failed to present evidence that Lisa acted alone in murdering Kurt and that at Lisa's trial the State directly contradicted the theory of motive it later attributed to Wilson at his trial. The court found the issues were different in time and type from the claims raised in the original petition and thus were time barred.

The district court held a 2-day evidentiary hearing on Wilson's claims in January 2013. Judge Robert Bednar handled this hearing; a different judge had presided at Wilson's criminal trial in 2001.

At the evidentiary hearing on Wilson's habeas claims, Wilson's counsel asked him why he had told the police that he had heard about the murder on Friday, March 17, 2000, when the body had not been found until March 24. Wilson said that he had initially told the police that he knew it was a Friday and that they had pressured him to say whether it was the 17th or the 24th. Unsure of the date, he said, he simply picked the 17th. Wilson said that between his preliminary hearing and trial he had only met with Waite two or three times for no more than 30 minutes each time. Wilson said that Waite never went over the witness list Wilson provided him.

Wilson said that during the trial, he had found a police report indicating that Boldridge's mother had spoken to Boldridge on Sunday, March 19—after Goodpasture

7

alleged that the murder occurred. Wilson said he had shown that to Waite during the trial but that after Waite read the report, he had indicated to Wilson that bringing up the evidence would undercut Wilson's alibi defense.

Criminal-defense attorney Kurt Kerns, who had no involvement in Wilson's murder trial, testified for Wilson as an expert witness. He said that in his expert opinion, Waite had been ineffective because he failed to investigate and present evidence on the issues raised in each of the ineffective-assistance-of-counsel claims the court was considering. Kerns pointed to several specific pieces of evidence:

- that Boldridge was alive as much as 37 hours after the time the eyewitness, Goodpasture, gave for the murder;
- that taped, secret conversations demonstrated that Wilson had no involvement with Boldridge's murder;
- that Goodpasture had written letters contradicting his statements to police; and
- that Kim Sampson-Wilson and Goodpasture had conspired to falsely accuse Wilson while in jail.

In addition, Kerns said that there were serious discrepancies in the statements Goodpasture made implicating Wilson and that Waite did not address the discrepancies when cross-examining Goodpasture. Goodpasture's initial statements to police did not implicate Wilson. Several months after the murder, Goodpasture said that "everything had come back to him," and he implicated Wilson. Even so, Goodpasture's story changed in a number of ways over time.

Wilson presented evidence to the court on the claims Kerns mentioned. Substantial evidence suggested that Boldridge was alive 37 hours after the time Goodpasture gave for his murder. Police reports indicated that Boldridge's mother, a neighbor, and two teenage girls had told the authorities that they had spoken to Boldridge after the date and time that Goodpasture said Boldridge had been killed (late Saturday, March 18, 2000, or early Sunday, March 19, 2000). Boldridge's mother told the police that no one had heard from

8

Boldridge since Sunday, March 19, 2000, and Boldridge's neighbor said he spoke to Boldridge when he went to get his mail on Monday, March 20, 2000. The Stewart sisters—ages 13 and 14—said they briefly spoke to Boldridge at a gas station on their way home from school on Monday, March 20, 2000. Boldridge's brother, Duane Boldridge, said he had called his mother on Sunday, March 19, 2000, and that Boldridge had called her while they were talking. Copies of the police reports were available to Waite at both the Atchison County Sheriff's Department and the Kansas Bureau of Investigation (KBI).

Wilson also provided the district court with transcripts of taped, secret conversations that he said demonstrated that he had no involvement with Boldridge's murder. The tapes involved Lisa Boldridge, who Goodpasture testified at trial had handed the shotgun used to kill Boldridge to Wilson before the murder.

About 2 weeks after the police found Boldridge's body, Lisa went to Wilson's house wearing a wire (unbeknownst to Wilson), and the police taped a conversation between Lisa and Wilson. Both Lisa and Wilson were under investigation by this time. Wilson seemed not to know who Lisa was until she introduced herself:

"Lisa: Hi.
"[Wilson]: Hi.
"Lisa: Kirk [Wilson]?
"[Wilson]: Yeah.
"Lisa: I need to talk to you. There's something that happened to Kurt Boldridge and I'm getting some heat over it. And I don't know, I'm just wondering, you know, if we can talk a minute.
"[Wilson]: Who, who am I talking to?
"Lisa: Lisa Boldridge.
"[Wilson]: That's you???!!!
"Lisa: Yeah."

9

Wilson told the court that he had not recognized Lisa because he had not seen her for at least 5 years and her appearance had changed. Wilson said that they had both been trustees in jail in the mid-90s and had "pass[ed] in the hall." Since then, he said he had only spoken to her once over the phone in August 1999 to tell her to stop bothering his son, who was living with Boldridge's and Wilson's ex-wife, Sandy.

After Wilson learned who Lisa was, he asked her to come back later and then alerted Investigator Myer that Lisa had approached him. Investigator Myer told Wilson to speak with Lisa to see if he could find anything out about Boldridge's murder. Wilson said that when Lisa had returned, he had said to her, "I didn't even know who you was when you came here." He also said that he had indicated he hadn't met Boldridge and didn't know what he looked like until Boldridge's picture was in the paper after the police found his body.

Investigator Myer then went to Wilson's house wearing a recording device (again, unbeknownst to Wilson). He taped his conversation with Wilson, who said that he had not known who Lisa was before she introduced herself. He also said that he had thought Lisa was involved with the murder.

At the evidentiary hearing, Wilson also presented the district court with two letters Goodpasture had written that indicated he was not present at the crime scene and that he was unsure whether Wilson had murdered Boldridge—significantly contradicting his statements to the KBI. One letter was mailed on September 20, 2000, *after* Goodpasture had started telling the police that Wilson murdered Boldridge. In that letter, Goodpasture wrote: "It's possible [Wilson is] guilty. But I don't [k]no[w.] But my sense tells me other[wise]. What if [they] sentence the wrong person[?] I['m] glad I['m not a Judge. Cause I couldn[']t deal with it. I just hope they get the right one." The other letter, sent on August 14, 2000, said, "I think Kim is in jail with Lisa Boldri[d]ge[.] Everybody thinks Kirk had something to do with it. I don[']t know but I['m] sure Kim is having a picnic."

10

Waite had introduced one Goodpasture letter at trial—a romantic letter that Goodpasture had written to Cindy Higley, who was Skeen's girlfriend. In that letter, Goodpasture said: "Everyone thinks that [the] deal with Kirk [Wilson] is over. But it['s] not. I don[']t know anything[,] but I['m] not so sure he's not involved." It also said that Goodpasture had wanted Wilson's "ass cook[ed]." During cross-examination, Waite drew attention to the fact that Goodpasture was allegedly involved with two women who were dating other men, that he had written Higley multiple letters while in jail, that he was angry with Wilson for beating him up, and that he had told the police that the beating was related to his alleged relationship with Kim. But Waite did not present evidence that Goodpasture had mailed the two additional letters noted above, each indicating that Goodpasture was not present at the crime scene and was unsure whether Wilson murdered Boldridge.

Wilson presented police reports indicating that after Boldridge's murder, Goodpasture's cellmate, Sean Kelley, had told the police that Kim had been having an affair with Goodpasture and had sent him a letter from jail discussing Boldridge's murder. Kelley told the police that the letter from Kim to Goodpasture had indicated that Wilson shot Boldridge, that the weapon used was not in the river, and that Kim knew why Wilson murdered Boldridge. Kelley also indicated that Goodpasture had said he had heard Wilson bragging about murdering Boldridge.

Wilson presented evidence that there were serious discrepancies in Goodpasture's statements to the KBI and that Waite did not address these discrepancies when cross-examining Goodpasture. Goodpasture made statements to the KBI on the following dates:

- On March 30, 2000, Goodpasture spoke with the KBI about Boldridge's murder but did not implicate Wilson or suggest that Goodpasture had firsthand knowledge of the murder.

11

- On August 3, 2000, Goodpasture told the KBI that Wilson had beat him and Kim, saying, "'If you guys want to [have sex], then [do it].'" Goodpasture also said he had not discussed the Boldridge homicide with Wilson but that Kim thought Wilson was responsible. Goodpasture said he was not sure whether Wilson was responsible.

- On September 14, 2000, Goodpasture took a polygraph examination. He stated that he had not been present when Boldridge was shot and that he had not taken part in the murder. He also indicated that Lisa and Wilson could have been involved in the homicide.

- On September 19, 2000, the KBI received a letter from Goodpasture indicating that while Wilson was beating Goodpasture and Kim, he had said the beating was "nothing compared to what he was going to do with Gary Skeen," and "if [Goodpasture] thought what happen[ed] to [Boldridge] was bad just wait." That same day, Goodpasture told the KBI that he had tried to block out the Boldridge homicide but that everything had come back to him.

   He described the murder as follows: On March 18 or 19, Wilson came over to Gillis' house and told Skeen and Goodpasture that Boldridge had "laid his hands on" Wilson's kid. Wilson, Skeen, and Goodpasture left and went to Boldridge's sometime between 10 p.m. and 1 a.m. Lisa let them in to Boldridge's house, and Skeen said Wilson was going to kill Boldridge. Goodpasture saw "a black male with no shirt on, sitting at the end of a bed, feet and legs straight out." Wilson was trying to hold a pillow to the back of the man's head, and the man was slumped over, like he might have been asleep. When Goodpasture, Skeen, and Wilson left, Goodpasture saw a silver revolver lying in the front seat of the car. Wilson then dropped Goodpasture and Skeen off at Gillis' house. Goodpasture didn't think Wilson knew that he had come into Boldridge's house that night.

12

- On September 21, 2000, Goodpasture told the police that on the Thursday or Friday of the week before the police found Boldridge's body, Goodpasture had been at Gillis' house, and Wilson had told him "'he was going to kill that son of a bitch [Boldridge]'" because Boldridge had raped or molested Wilson's son. Goodpasture said that he and Skeen had tried to talk Wilson out of killing Boldridge but that he had been very persistent in saying he wanted to kill him. Goodpasture said that Lisa had let them into Boldridge's house and that he had seen her with a shotgun. He said that Lisa had handed Wilson the gun and said, "'[H]ere, Kirk, just kill him,'" while Goodpasture and Skeen stood by watching. Boldridge was asleep in the bed, about half covered up with a blue comforter. Wilson went to the left side of the bed and shot Goodpasture, who was lying on his back, in the face, from about 12 to 18 inches away. Goodpasture and Skeen were scared and ran out to the car. Wilson then drove Goodpasture and Skeen to the Missouri River while Lisa followed in a separate car. Goodpasture saw that the gun was wrapped in a blanket and that Wilson wiped it down, but he could not remember for sure what happened to the gun.

- On September 22, 2000, Goodpasture requested to speak to the police in the early morning hours because he had just remembered what happened to the gun. He said that after he, Skeen, and Wilson had left Boldridge's house, Wilson had driven over the Missouri River bridge and parked along the river bank just north of the bridge. Wilson took the gun from Lisa, wiped it down with a blanket, and threw the gun and the blanket into the river.

  Goodpasture also remembered that after the murder he had seen a hole on the *left* side of Boldridge's head about the size of a quarter but that "[i]f you were looking from the foot of the bed, the gun shot would have been on the *right* side of

13

[Boldridge's] face." (Emphasis added.) The skin of Kurt's face was folded back on the top side of the hole.

- On October 4, 2000, Goodpasture told the KBI that before and after the shooting, he and Skeen had searched Boldridge's bedroom for cocaine. He also said that before Wilson shot Boldridge, he had helped Wilson load the shotgun. After Wilson disposed of the gun, Goodpasture said that Wilson had said that he had found it "with the butt in the water and the barrel sticking straight up." Goodpasture said Wilson had told Skeen that he had retrieved the gun and thrown it into the river behind the prison in Leavenworth. But Goodpasture also said he overheard Wilson tell Skeen that he had destroyed the gun with a sledgehammer and a rock.

  Goodpasture also indicated for the first time that Wilson had told him that the two of them, Lisa, and Skeen would each receive about $20,000 in insurance proceeds because Boldridge had a $100,000 life insurance policy. When Goodpasture declined his share of the money, Wilson drove Goodpasture and Skeen to the river, and while Skeen held a pistol to Goodpasture's head, Wilson injected a clear liquid into Goodpasture's arm to "calm Goodpasture down."

- On October 9, 2000, Goodpasture told the KBI that before the murder, Skeen had not tried to talk Wilson out of murdering Boldridge. Goodpasture reported that Skeen had told Wilson, "'If you want to kill him, kill him'" and had then said that Goodpasture had to go with them to Boldridge's house. At the house, Goodpasture told Wilson how to load the gun, and Wilson put the shell in. Before Wilson shot Boldridge, Boldridge started to wake up, raising his head up about 4 inches. After that, Wilson looked for cocaine under pillows on the other side of the bed.

14

Goodpasture reported that at that point he had said, "'Maybe I can save him,'" and Skeen pointed a pistol at Goodpasture until he changed his mind. Goodpasture and Skeen then continued the search for cocaine.

Goodpasture said that he had later suggested they call 911 and leave the phone off the hook. This angered Skeen, who pointed the pistol at Goodpasture's head. Goodpasture told Skeen, "Gary, don't, we've been like brothers. Don't shoot me. If you want me to, I'll shoot him. Just don't kill me. I'm with you. I won't say nothing." Skeen threw the blanket off Boldridge's body, up toward his head, and told Goodpasture that he had to perform oral sex on the body or they'd have to kill him. Goodpasture said he then had put his mouth on Boldridge's penis and had spit on it at Skeen's command. Skeen then made Goodpasture touch the box of shotgun shells and put his fingerprints on the headboard, dresser, boxes, and walls.

Wilson then drove Skeen and Goodpasture to the river. On the way, he stopped on the road to talk to someone. Goodpasture couldn't see the person but thought it was Larry Haley. At the river, Wilson wiped the shotgun down and threw it in river. He then took Skeen and Goodpasture to Gillis' house where they spent the night.

Goodpasture said that the next day, Wilson had said that he, Lisa, Skeen, and Goodpasture would each receive $20,000 from Boldridge's $100,000 life insurance policy because there were five people involved with the murder. Goodpasture thought the fifth person was Larry Haley. Goodpasture, Wilson, and Skeen then went back to the river where Wilson said he had dropped the shotgun. Wilson told the others he had seen the barrel sticking up, so he retrieved it and had Haley drive him to Leavenworth to get rid of the gun.

15

Kerns testified that Waite had failed to adequately investigate the case and that the failures he testified about were not the result of reasonable decisions of defense strategy:

> "[T]here's a difference between a strategy decision and a bizarre failure to introduce evidence. I think this falls along the lines of a bizarre failure to introduce evidence. When every single strategy happens to be the one that's the laziest strategy, you have to start calling into question that strategy. When every single excuse is, well, it was strategy, and by the time we get to the 10th this-is-a-strategy thing and every single time the strategy thing just happens to coincide with the least effective way to do it, you have to start calling into question whether this is a real strategy thing or if we got a real problem."

The district court found merit in all five of Wilson's claims and ordered a new trial. The State has appealed to this court.

ANALYSIS

I. *Wilson's Trial Counsel Was Constitutionally Ineffective.*

We begin with the standards against which we must measure the conduct of Wilson's trial attorney. To obtain habeas relief, Wilson had the burden to show two things set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984): (1) that his attorney's work was below minimum standards and, thus, was constitutionally deficient; and (2) that his attorney's substandard work prejudiced his defense. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013); *Mattox v. State*, 293 Kan. 723, 725-26, 267 P.3d 746 (2011). We often refer to these two parts of the *Strickland* test as the "performance prong" and the "prejudice prong." *Mattox*, 293 Kan. at 726. The benchmark for judging Wilson's claim was whether his attorney's conduct "'"so undermined the proper functioning of the adversarial process"'" that the district court could not rely on his trial "'"having produced a just result."'" *Edgar v. State*, 294 Kan. 828, 837, 283 P.3d 152 (2012).

16

When the district court has conducted an evidentiary hearing, we review its factual findings to be sure that they are supported by substantial evidence; if they are, we must accept them. *Adams*, 297 Kan. at 669; *Mattox*, 293 Kan. at 725; *Thompson v. State*, 293 Kan. 704, 715-16, 270 P.3d 1089 (2011). Whether the defendant has met the two-part showing required under *Strickland* presents a legal issue that we review independently, without any required deference to the district court. *Adams*, 297 Kan. at 669; *Mattox*, 293 Kan. at 725; *Thompson*, 293 Kan. at 716.

When we evaluate the performance prong of the *Strickland* test, we don't view the attorney's performance through the corrective lens of hindsight. *Rowland v. State*, 289 Kan. 1076, 1086, 219 P.3d 1212 (2009). Instead, we presume that the attorney's performance fell within the wide range of reasonable professional assistance and consider the entire range of possible reasons why the attorney might have made the decisions that he or she did. See *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1407, 179 L. Ed. 2d 557 (2011); *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006). Our test is not what the best or even a good attorney would have done but whether some reasonable attorney could have acted, under the circumstances, as the defense attorney acted at trial. *Hardwick v. Benton*, 318 F. Appx. 844, 846 (11th Cir. 2009).

Much of this case rests on whether the decisions Waite made in defending Wilson were in pursuit of some reasonable defense strategy: An attorney's strategic decisions are essentially not challengeable if the attorney made an informed decision based on a thorough investigation of the facts and the applicable law. *Edgar*, 294 Kan. at 839; *Thompson*, 293 Kan. at 716. But the failure to complete a thorough investigation is a ground for establishing ineffective assistance of counsel. *Shumway v. State*, 48 Kan. App. 2d 490, 512, 293 P.3d 772, *rev. denied* 298 Kan. ___ (October 1, 2013); *McHenry v. State*, 39 Kan. App. 2d 117, 123, 177 P.3d 981 (2008) (finding that an attorney's failure to investigate key issues surrounding the State's witnesses fell below minimum standards

17

in a case that turned on credibility); *State v. James*, 31 Kan. App. 2d 548, 553-55, 67 P.3d 857, *rev. denied* 276 Kan. 972 (2003) (finding an attorney ineffective when he failed to contact or subpoena defendant's witnesses); *State v. Sanford*, 24 Kan. App. 2d 518, 521-23, 948 P.2d 1135, *rev. denied* 262 Kan. 967 (1997) (stating that defense counsel's failure to make more than perfunctory attempts to contact alibi witnesses fell below minimum standards).

In addition, the attorney's strategy itself must be reasonable. *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 33, 287 P.3d 855 (2012); *Bledsoe v. State*, 283 Kan. 81, 93-94, 150 P.3d 868 (2007); *Rawlins v. State*, No. 103,389, 2010 WL 444638, at *23-24 (Kan. App. 2010) (citing *Bullock v. Carver*, 297 F.3d 1036, 1046 [10th Cir. 2002]), *rev. denied* 291 Kan. 913 (2011). While deliberate strategic decisions that experienced attorneys might disagree about cannot establish ineffective assistance of counsel, "the strategy itself must still pass muster." *Bledsoe*, 283 Kan. at 93-94. If no competent attorney would have adopted the strategy, it falls below minimum constitutional standards. See *Bledsoe*, 283 Kan. at 93-94; *Mashaney v. State*, No. 101,978, 2010 WL 3731341, at *11 (Kan. App. 2010); *Rawlins*, 2010 WL 444638, at *23-24.

For example, in *Ontiberos*, defense counsel did not introduce available test results at trial to contradict the State's test results indicating that Ontiberos fell into a high-risk category for committing sexual offenses. The court held that the failure to contradict some of the "more damaging evidence presented at trial" was a constitutionally deficient performance because the attorney had either utilized an unreasonable strategy regarding the test results or had failed to familiarize himself with the evidence in the case. 295 Kan. at 33.

We then evaluate the prejudice prong of the *Strickland* test and determine whether the defendant has shown a reasonable probability that the result of the trial would have

been different but for the defense attorney's inadequate work. *Mattox*, 293 Kan. at 725-26. A defendant can establish prejudice by demonstrating that an accumulation of errors created a reasonable probability of changing the outcome of the trial. See *Ontiberos*, 295 Kan. at 40-41. While *Ontiberos* appears to be the only Kansas case specifically applying a cumulative-error analysis to an attorney's errors under *Strickland* and granting relief, that rule is in line with most other courts. See Moyer, *To Err Is Human; To Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess* Strickland *Errors*, 61 Drake L. Rev. 447, 466-67 (2013) (noting that a majority of federal circuits apply cumulative-error analysis in applying the *Strickland* prejudice test).

Here the State argues that Wilson has not presented any evidence indicating that Waite failed to investigate the case or that his actions at trial weren't protected strategic decisions. The State insists that in the absence of any evidence that Waite's decision was not strategic, Wilson cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, citing *Burt v. Titlow*, 571 U.S. ___, 134 S. Ct. 10, 17, 187 L. Ed. 2d 348 (2013) (stating that the absence of evidence of counsel's effectiveness cannot overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance); *Pinholster*, 131 S. Ct. at 1407 (stating that when trial counsel dies before a postconviction hearing, the reviewing court must consider the range of all possible reasons for trial counsel's decisions); and *Pabst v. State*, 287 Kan. 1, 17, 192 P.3d 630 (2008) (stating that when the allegedly ineffective counsel doesn't testify at the habeas hearing, the court's review of counsel's conduct is highly deferential).

1. *Waite's Representation Was Constitutionally Deficient in Several Respects.*

A. *Transcripts of Taped Conversations Indicating that Wilson Did Not Know Lisa Boldridge*

We first consider the State's brief argument that the transcripts of Wilson's conversations with Lisa and Investigator Myer (where he didn't know Lisa) would have been hearsay—which is generally inadmissible at trial—and that we cannot deem Waite's representation ineffective for his failure to seek the admission of inadmissible evidence. That argument overlooks a well-known exception to the hearsay rule in Kansas: When the alleged hearsay statement was made by someone who is present at the hearing and available for cross-examination, the statement is admissible. See K.S.A. 60-460(a); *State v. Stafford*, 296 Kan. 25, 47-48, 290 P.3d 562 (2012). Here Wilson testified at trial, so the State could have cross-examined him about his conversations with Lisa and Investigator Myer, and the admission of the transcripts would not have been barred by the hearsay rule.

The State's main argument on this issue is that Waite strategically declined to present transcripts of Wilson's conversations with Lisa and Investigator Myer to the jury. The State contends that Waite may have believed that if he introduced the evidence, the jury would have thought Wilson and Lisa were working together "to throw the police off their trail."

But that wouldn't have been a reasonable strategy decision. The transcripts would have been very important in this case because they would have created questions about Goodpasture's credibility and forced the jury to consider how it could be that Wilson did not recognize Lisa if he had been Lisa's co-conspirator just a few weeks before. The transcripts could only have helped Wilson's defense. The transcripts strongly suggest that Wilson wasn't involved with the murder. And Waite could have ensured that the jury didn't think Wilson and Lisa were working together; Waite could have presented

20

evidence that Wilson told Investigator Myer that he thought Lisa was involved with the murder.

Waite's failure to present the transcripts is evidence that a reasonable person might accept as sufficient to support the conclusion that Waite had either failed to investigate Wilson's case enough to find the taped conversations in the first place or made an unreasonable strategy decision not to offer them. Thus, Waite's failure to introduce the transcripts of the conversations satisfies the performance prong of the *Strickland* test.

### B. *Police Reports Contradicting the Date of the Murder*

At trial, the State presented evidence that the murder occurred on the night of Saturday, March 18, 2000 (or perhaps very early on Sunday, March 19). Waite did not present evidence that suggested Boldridge was still alive on Monday, March 20.

The State argues that this was a protected decision of trial strategy—Waite strategically chose to accept the State's date for the alleged crime and then present an alibi for that Friday night. The State notes that Waite's statement to Wilson at trial that the police report indicating that Boldridge's mother had spoken to him on Sunday, March 19, would have ruined his alibi demonstrates that it was a strategic decision.

We agree that Waite made a strategic decision. But an attorney's strategic decisions are only unchallengeable in habeas cases if counsel made an informed decision based on a thorough investigation of the facts and law applicable to the case. *Edgar*, 294 Kan. at 839; *Thompson*, 293 Kan. at 716; *Mashaney*, 2010 WL 3731341, at *11 ("[A] misinformed or vacuous strategy decision must not escape a full investigation for its ineffectiveness."). And here Waite's decision could not have been based on a thorough investigation of the facts. In this case, five different people—Boldridge's mother, his neighbor, the Stewart sisters, and Duane Boldridge—told police that they had heard or

21

seen that Boldridge was alive after the date and time that Goodpasture said he had died. Because no physical evidence linked Wilson to the crime, damaging Goodpasture's credibility as an eyewitness was critical to Wilson's case. It was not a reasonable trial strategy to agree to Goodpasture's date for the alleged crime simply because Wilson had an alibi on that date when as many as five witnesses could have offered conflicting testimony. See *Shumway*, 48 Kan. App. 2d at 502 (finding ineffective assistance of counsel when the time of the crime was a critical factor in determining guilt and counsel failed to call two witnesses who could have provided an alibi for the time of the crime); *McHenry*, 39 Kan. App. 2d at 123 (finding defense counsel ineffective when the trial turned on credibility and counsel failed to investigate State's witnesses and as a result was unprepared to present defendant's "most effective defense").

Moreover, several other considerations suggest that Waite didn't thoroughly investigate the case. First, Wilson's alibi—which was that he was in the same house as his *sleeping* son and *intoxicated* wife—was not a strong enough alibi to warrant declining an opportunity to damage the credibility of the only testifying eyewitness to the crime. This is particularly true because it is unlikely that—as the State also argues—the crime could have occurred as Goodpasture described it but at a later date. That's because Goodpasture had a weekday job that would have prevented him from observing the events he said happened after the murder.

The State also asserts that Waite's decision made sense because Boldridge's mother and neighbor would have been weak witnesses, arguing that during Lisa Boldridge's murder trial, Boldridge's mother had doubts about when she last heard from or saw Boldridge, and the neighbor said that he never saw Boldridge after he heard shots fired at his house. But the arguably weak testimony of two witnesses isn't a reason to decide not to call *any* of these witnesses. Even if Boldridge's mother and neighbor were not ideal witnesses, their testimony could have been corroborated by the Stewart sisters— who Waite never contacted—and Duane Boldridge.

22

As a result, we find that Wilson has overcome the presumption that Waite's conduct fell within the range of reasonable professional assistance. Because the reports were available in the police and KBI files, Waite would have discovered those witnesses if he had thoroughly investigated the facts of the case. The fact that he didn't introduce them at trial is substantial evidence that he didn't. Accordingly, Waite's conduct regarding the police reports was ineffective under the performance prong of the *Strickland* test.

### C. *Goodpasture's Letters to Cindy Higley*

The State also argues that Waite made a strategic decision not to use all of the letters Goodpasture wrote to Cindy Higley at trial. The State says that Waite knew about the letters Goodpasture wrote Cindy Higley because he listed "[*l*]*etters* from John Goodpasture to Cindy Higley" on his pretrial exhibit list. (Emphasis added.) The State also asserts that the letters would have been cumulative and thus unnecessary because Waite presented the general nature and content of the letters at trial. See *Bledsoe*, 283 Kan. at 103 (finding that the failure to present cumulative testimony is not ineffective assistance of counsel).

But failing to offer the September 20 letter was not a reasonable strategy decision. The fact that Goodpasture sent the letter *after* he started implicating Wilson in the murder would have impeached Goodpasture's credibility on the fact that the events of the murder suddenly came back to him, suggesting that he continued to lie to the KBI about the murder. The letter also would not have harmed Wilson's defense because the only relevant point it discusses is the fact that Goodpasture was unsure about Wilson's guilt. The September 20 letter also would not have been cumulative. It indicated that Goodpasture still had doubts about Wilson's involvement after he provided the only eyewitness account to the KBI. We find that Waite's failure to offer it fell below minimum standards.

23

On the other hand, we find that defense counsel could have reasonably decided not to present the August 14 letter, which indicated that Goodpasture was unsure of Wilson's involvement in the murder and that Kim should be happy that Wilson was being tried for Boldridge's murder. The letter was less useful in impeaching Goodpasture's credibility because it was written before Goodpasture began implicating Wilson in the murder.

Moreover, despite Wilson's argument that the letter would have supported a defense theory that Goodpasture and Kim framed Wilson (because it indicated that Kim wanted Wilson to be incarcerated), Waite may have had a valid strategic reason for not offering the letter. The evidence that supported the theory also implicated Wilson in the murder. As explained below, while there is evidence that Kim and Goodpasture may have been conspiring to frame Wilson, that evidence highlights the fact that Wilson's wife said he murdered Boldridge and corroborated Goodpasture's testimony. As a result, reasonable attorneys might not agree on whether to use the theory. Since Waite did present one of Goodpasture's letters at trial, the August 14 letter would only be useful if Waite adopted the defense theory that Goodpasture and Kim framed Wilson. Because he might have had a valid strategy reason for not adopting the theory, we find that Waite was not ineffective for failing to present the letter at trial.

D. *Waite's Cross-Examination of Goodpasture*

We have set out in detail earlier in this opinion the varying and contradictory statements Goodpasture made to law-enforcement officers between March 30, 2000, and October 9, 2000. A skilled trial attorney would be able to construct a highly effective cross-examination of Goodpasture from those statements. But we must determine not what a highly skilled trial attorney would do; we must determine what a minimally adequate cross-examination would be. Wilson was entitled to that minimum-level, constitutionally adequate performance.

24

Even applying that standard, Waite's cross-examination of Goodpasture was inadequate. Several key points were not explored at all:

- Goodpasture said on direct examination that a major reason he had initially lied to police was his desire to protect Skeen, who had been a friend since childhood. But in one of Goodpasture's statements to police, he said that Skeen had pointed a gun at him after the murder and forced Goodpasture to put his mouth on the dead man's penis; Goodpasture also told police that Skeen later held a gun to Goodpasture's head while Wilson injected Goodpasture with some clear liquid. Waite did not ask Goodpasture how he could have left such memorable details of the events out of his direct testimony at trial. Nor did he ask why he would have wanted to protect Skeen after Skeen had done these things to Goodpasture.

- As the district court noted in its factual findings, Boldridge's body was found lying on its stomach and on its right side. In his detailed statement to police on September 21, 2000, Goodpasture had said that Boldridge had been lying on his back when Wilson shot him from the left side of the bed (defined as the left side looking toward the headboard). That would have resulted in Boldridge being shot on the right side of his head. Goodpasture confirmed this location of the gunshot wound in a September 22, 2000, interview. But Boldridge was shot in his left temple. Waite did not ask about this discrepancy.

- Waite didn't ask Goodpasture whether he knew what he had been injected with by Wilson and whether it might have impacted his ability to recall the events.

- Waite didn't ask Goodpasture about specific statements in various letters he had sent from jail, including his statement on September 20, 2000—after he had begun telling police that Wilson committed the murder—that Goodpasture didn't know whether Wilson had been involved.

We recognize that Waite *did* cross-examine Goodpasture, and he made some good points in doing so. He began by pointing out the plea agreement under which

25

Goodpasture would be allowed to plead to a relatively low-level felony (conspiracy to commit aggravated burglary) rather than the first-degree-murder charge initially brought against him. He also established generally that Goodpasture had made inconsistent statements and had sometimes lied to police. He also got Goodpasture to admit that he had written to Higley that Goodpasture wanted Wilson's "ass cooked" (though the prosecutor had Goodpasture testify on redirect that this referred to the incident when Wilson beat up Goodpasture, not to the murder). Based on the transcript, our Supreme Court noted that Waite had "vigorously cross-examined Goodpasture." *State v. Wilson*, 281 Kan. 277, 281, 130 P.3d 48 (2006).

But that characterization of a "vigorous[]" cross-examination must not be taken out of context. It came during the court's review of Wilson's challenge to the sufficiency of the evidence to convict him. Wilson argued on direct appeal that because Goodpasture had made contradictory statements, his testimony wasn't sufficient to support a guilty verdict. In that context, the court noted that the jury had heard Goodpasture and that Goodpasture had been cross-examined. The court also was required to review the facts in the light most favorable to the State, since the jury had ruled in its favor. 281 Kan. at 280-81. Our Supreme Court did not have before it the additional evidence presented to the district court on Wilson's habeas claims, evidence that made additional areas of cross-examination crucial. See *Driscoll v. Delo*, 71 F.3d 701, 710-11 (8th Cir. 1995) (finding ineffective assistance of counsel where attorney failed to cross-examine key eyewitness with inconsistent prior statements and witness' story about events had expanded and gained clarity over time).

We do not suggest that an attorney must ask every potential cross-examination question, even of a key witness. Sometimes brevity is key in making a simple yet telling point. Here, however, there were too many key details unexplored in Waite's cross-examination of Goodpasture for us to accept the normal presumption that Waite made reasonable decisions to limit his cross-examination to only a few key points. Rather, we

26

conclude that Waite's failure showed a lack of appropriate presentation and fell below the objective standard of reasonableness. Goodpasture was too important a witness in the case against Wilson to leave so much unexplored.

### E. *Kim's Letter to Goodpasture*

Wilson's final claim that was accepted by the district court was that Waite should have introduced evidence about a letter Kim wrote to Goodpasture while he was in jail. Wilson argues that the letter was crucial to show that Kim and Goodpasture—who didn't implicate Wilson until he beat them in August 2000—were communicating "to string enough facts together to get Wilson arrested for the crime" before implicating him. As a result, Wilson says that Waite's decision not to offer the letter at trial was an unreasonable strategy.

Under the presumption that Waite's performance fell within the wide range of reasonable professional assistance and the requirement that we consider the entire range of possible reasons Waite could have had for making his decision, we note one reasonable, strategic reason why Waite could have decided not to introduce the evidence—it implicated Wilson in the murder.

Information about the letter came from Kelley, Wilson's cellmate. Kelley's statements about the letter Kim allegedly wrote to Goodpasture (who let Kelley read the letter) would have corroborated Goodpasture's eyewitness testimony that Wilson murdered Boldridge. While Wilson may argue that the letter really shows a conspiracy between Kim and Goodpasture to falsely implicate Wilson, that isn't the only conclusion that could be drawn from the evidence. The letter's inference of collusion to falsely implicate Wilson is not so strong as to overcome the presumption that Waite's decision not to introduce the letter was within the wide range of reasonable professional judgment about what evidence to introduce.

F. *The District Court Did Not Err by Considering Expert Testimony from Attorney Kerns.*

The State also contends that the district court improperly relied on Kerns' expert testimony as evidence that Waite was ineffective and that we cannot consider the testimony substantial evidence for the court's decision. The State cites New Mexico, Missouri, and federal cases that say such testimony is unnecessary because it does not explain something outside the trial judge's areas of expertise. See *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) ("[I]t would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable . . . [because whether an attorney was ineffective] is a question of law to be decided by the . . . courts."); *Sidebottom v. State*, 781 S.W.2d 791, 794-95 (Mo. 1989) (finding that the court did not err in excluding attorney expert testimony on ineffective assistance of counsel because "the motion court was at least as qualified as the witness to form an opinion on the question"); *Lytle v. Jordan*, 130 N.M. 198, 212, 22 P.3d 666 (2001) ("[I]t is superfluous for expert witnesses to advise a court . . . about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness.").

But the mere fact that the ultimate question at issue is a legal one for the court to determine does not make potential testimony on the subject inadmissible. The Kansas Rules of Evidence make clear that expert testimony "is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact." K.S.A. 60-456(d). Accordingly, when expert testimony may be helpful to the court in understanding the background facts of the case or determining the ultimate legal issue, the testimony is admissible. See K.S.A. 60-456(b); *State ex rel. Schmidt v. Memorial Park Cemetery, Inc.*, No. 108,063, 2013 WL 1943071, at *11-12 , *rev. denied* 298 Kan. ___ (December 27, 2013).

28

While it's true, as the State argues, that many judges have had experience trying criminal cases, many have not. Certainly, most judges have not had the level of experience of Kerns, who had defended 10 murder trials and handled more than 60 jury trials. His testimony helped to place the legal issues of this case into context and thus was admissible. See K.S.A. 60-456(b); *Memorial Park Cemetery*, 2013 WL 1943071, at *11-12.

So, expert testimony may be admitted, but since the ultimate question is a legal one, that testimony is not determinative. See *KPERS v. Kutak Rock*, 273 Kan. 481, 493, 44 P.3d 407 (2002). Thus, the district court is free to admit expert testimony regarding the *Strickland* analysis, but that court—and any appellate court on review—must make its own independent conclusions. While the district court cited in part to Kerns' testimony in the court's ruling, the district court made its own independent legal conclusions. Moreover, based upon our own independent review, we agree with those conclusions, and we too found Kerns' testimony helpful. The district court did not err here by admitting Kerns' testimony.

### 2. *Waite's Failure to Introduce the Taped Conversations, Police Reports, and Letters to Cindy Higley Prejudiced Wilson's Defense.*

Our next question, then, is whether Waite's conduct that fell below minimum standards for attorney performance prejudiced Wilson's defense. See *Mattox v. State*, 293 Kan. 723, 725-26, 267 P.3d 746 (2011). Here one major theme pervades Waite's errors—his failure to damage the credibility of the State's only eyewitness.

This theme was evident in Waite's failure to introduce transcripts of Wilson's conversations with Lisa and Investigator Myer. The district court weighed the transcripts, heard portions of the tapes, and heard Wilson's testimony about them, and the district

court found that Wilson did not recognize Lisa when she approached him. We do not reweigh that evidence on appeal. See *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009). The fact that he did not recognize her cast serious doubt on whether he was present at the murder as Goodpasture described it.

This theme was also evident in Waite's ineffective cross-examination of Goodpasture. Goodpasture remembered key details in dramatically different ways, and his inability to mention memorable details until he had retold his story several times strongly suggested that he was making it up as he went along.

Because Goodpasture was the only eyewitness, there is a reasonable probability that the outcome of Wilson's trial would have been different if the jury had heard the conversations in the transcripts and seen an effective cross-examination of Goodpasture. We cannot rely on Wilson's trial as ""having produced a just result.""" *Edgar v. State*, 294 Kan. 828, 837, 283 P.3d 152 (2012).

The other two errors—Waite's failure to introduce police reports indicating that Boldridge was seen alive after the date Goodpasture said he was murdered and the September 20 letter Goodpasture wrote to Cindy Higley—also undermine our confidence in the trial's outcome, when taken together. These errors also fit within the theme of failing to damage Goodpasture's credibility. Since Waite didn't introduce the police reports, the jury didn't know that there was a real question about the timeline Goodpasture provided. And because Goodpasture worked during the week, the murder was unlikely to have happened as he described but on a later date.

Furthermore, the September 20 letter also would have seriously undermined Goodpasture's credibility. Waite's failure to introduce it kept the jury from hearing evidence that Goodpasture continued to lie to the police about his knowledge of Boldridge's murder after he began implicating Wilson. Since there was no physical

evidence implicating Wilson in the murder, damaging Goodpasture's eyewitness testimony was crucial to Wilson's defense.

When taken together, those errors satisfy the prejudice prong of the *Strickland* test: there is a reasonable probability that the result of Wilson's trial would have been different if Waite had provided adequate representation in the ways we have noted. Accordingly, the district court properly ordered a new trial.

II. *We Need Not Consider the Issues Presented in Wilson's Cross-Appeal*.

The district court denied Wilson's attempt to amend his habeas claim to present two additional grounds for a finding that Waite had failed to provide adequate representation. Wilson cross-appealed that denial. But there is no reason for us to consider the cross-appeal since we have already concluded that Wilson is entitled to a new trial. He seeks no other relief on his cross-appeal.

The district court's judgment is affirmed.