NOT DESIGNATED FOR PUBLICATION

No. 115,650

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN BALBIRNIE,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed November 17, 2017. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Stephen A. Hunting*, county attorney, and *Derek Schmidt,* attorney general, for appellee.

Before MALONE, P.J., LEBEN, J., and KEVIN P. MORIARTY, District Judge, assigned.

LEBEN, J.: John Balbirnie was found guilty by a jury of the second-degree murder of Paul Nicholson, who died from a stab wound in the chest. Balbirnie now challenges his conviction on the ground that the attorney who represented him at trial provided inadequate representation.

We agree that his attorney made one significant error—failing to get admitted into evidence a recording of the 911 call to police. The witness who called police, Tarissa Brown, said another man (her fiancé, Phillip Wallace) had stabbed Nicholson. That would have been important evidence to present to the jury.

But we do not lightly overturn jury verdicts. Balbirnie must show not only that his attorney provided inadequate representation but also that this worked to his detriment—specifically, he must show a reasonable probability that the trial's outcome would have been different.

We do not find that to be the case. As the district court noted after listening to the 911 recording, Brown was understandably quite excited when she called, and it's hard to follow all of the details she reported. Additionally, she didn't say on the call whether Wallace had stabbed Nicholson in the chest or in the back. The evidence suggested different men stabbed Nicholson in the chest and in the back, with the chest wound the fatal blow. In context, the 911 call was not nearly as important as the testimony of two eyewitnesses who said Balbirnie stabbed Nicholson in the chest.

With that overview, we will more fully set out the background for this appeal. In 2011, a jury found Balbirnie guilty of second-degree murder for the death of Nicholson. On appeal, our court affirmed the conviction. *State v. Balbirnie*, No. 106,849, 2013 WL 3455772 (Kan. App. 2013) (unpublished opinion).

In 2015, Balbirnie filed a motion for habeas corpus relief, a mechanism that lets a convicted defendant present a claim that a defense attorney provided inadequate representation. Balbirnie claimed that the attorney who defended him at trial, Frederick Meier, did a poor job and that Balbirnie was convicted because of Meier's inadequate representation. The district court held an evidentiary hearing on the habeas motion and then denied it. Balbirnie has appealed that ruling to our court.

Balbirnie's claim arises out of a defendant's constitutional right to be represented in a criminal trial by an attorney. That right would be meaningless if the attorney didn't have to provide appropriate representation. So the United States Supreme Court has

2

interpreted the Sixth Amendment to require that defense counsel provide "reasonably effective assistance," meaning that a defendant must show "that counsel's representation fell below an objective standard of reasonableness" for it to be below constitutional standards. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In addition, to obtain relief (here, setting aside the jury's verdict and giving him a new trial), the defendant must show that the inadequate representation prejudiced the defendant's case at trial. 466 U.S. at 692-96.

Taken together, then, Balbirnie had to show two things to be entitled to a new trial here: (1) that his attorney's work was below minimum standards and was thus constitutionally deficient; and (2) that his attorney's substandard work prejudiced his defense. *Mattox v. State*, 293 Kan. 723, Syl. ¶ 1, 267 P.3d 746 (2011); *Wilson v. State*, 51 Kan. App. 2d 1, Syl. ¶ 1, 340 P.3d 1213 (2014). On that prejudice requirement, the defendant must show a reasonable probability that the result of the trial would have been different but for the attorney's inadequate work. *Mattox*, 293 Kan. at 725-26; *Wilson*, 51 Kan. App. 2d at 15.

With these standards in mind, we turn to the primary claim Balbirnie is pursuing on appeal about the representation Meier provided at trial. That claim is that Meier should have introduced the recording of the 911 call to police during which Brown said "[m]y fiancé stabbed him."

The district court said that the failure to present the recording could have been appropriate trial strategy "given the obvious emotional turmoil the witness[] experienced at the time of the call." The district court speculated that it might be "better to avoid this type of evidence from being presented to a jury." But while we defer to the district court on factual findings made from the evidence it heard, *Wilson*, 51 Kan. App. 2d at 14, this conclusion wasn't based on the evidence. In fact, Meier testified that his failure was due not to strategy but to oversight—he had assumed the State would present the recording in

3

its case and hadn't thought to subpoena anyone to introduce it at trial. Meier admitted that the 911 call would have given the jury an alternate suspect and that he wished he could have presented it to the jury.

So the undisputed evidence was that Meier failed to introduce the 911 call only because he hadn't issued a subpoena, something that could easily have been done had he thought to do it. Since Balbirnie's defense was that someone else stabbed Nicholson, causing his death, and Brown had said her fiancé had stabbed Nicholson, failing to introduce the 911 call was below an objective standard for reasonably effective representation.

The real question is whether the failure to introduce the 911 call prejudiced Balbirnie's defense. The district court concluded it didn't, but we must make our own determination of the legal questions of whether the representation was inadequate and whether any inadequacy prejudiced the defense. *Wilson*, 51 Kan. App. 2d at 14. To consider this question, we must put the missing evidence—the recording of the 911 call—into context with the evidence that was presented to the jury.

Nicholson was killed after disagreements arose between a group that had gathered at Phillip Wallace's apartment one evening in the summer of 2010. Present were Wallace and his fiancé, Brown, Nicholson, Balbirnie, and Brandon Ellsmore, who had his young daughter with him. Brown, Wallace, and Ellsmore testified at trial.

Brown lived with Wallace at his apartment. She didn't see what started things— she said Nicholson had Wallace in a chokehold when she came into the dining room. She also noticed that Ellsmore, then in the corner of the room, had a "messed up" eye. Soon after she entered, Nicholson and Ellsmore started fighting.

4

She said they eventually made their way into the living room, where Balbirnie had been. The fight stopped for a time, but Wallace and Nicholson began to fight again. She stepped in between, but she said Nicholson threatened to hit her if she didn't move away. She said he then swung toward her and hit Wallace in the face. At that point, she said, Ellsmore stabbed Nicholson in the back, but Nicholson continued fighting.

Brown said that Balbirnie then tried to pull Nicholson off of Wallace, eventually taking a knife out and stabbing Nicholson twice in the right side of his back. She then left the apartment to call 911. While outside, she heard a window shatter and saw Nicholson stumble and fall into the backyard. She said she then heard Balbirnie say, "I stabbed the dude in the neck."

Ellsmore, who is Brown's cousin, admitted that he had stabbed Nicholson in the back. He entered into a plea agreement with the State under which he pled guilty to aggravated battery and agreed to testify truthfully at Balbirnie's trial.

Ellsmore said that Wallace and Nicholson initially got into an argument about cooking, and Wallace asked Nicholson to leave the apartment. When Ellsmore joined in—telling Nicholson to leave—Ellsmore said Nicholson punched him in the face. He said that he and Nicholson "made up," but then Wallace and Nicholson got into a fight. Ellsmore said he tried, with his daughter, to leave the apartment but that Nicholson charged at him. That's when Ellsmore said he took a knife off a nearby table and stabbed Nicholson in the back. But Nicholson didn't stop fighting, according to Ellsmore.

At that point, Ellsmore said that Balbirnie stabbed Nicholson twice in the chest. Ellsmore said that Nicholson then went downstairs with Wallace and Balbirnie following him. Ellsmore said he heard Balbirnie say, "I got him."

5

Wallace said that when he and Ellsmore were on the back porch, Ellsmore saw Nicholson walking down the alley. And since Ellsmore knew Nicholson, Wallace invited him up to the apartment. According to Wallace, after Wallace and Nicholson argued about food, Wallace asked Nicholson to leave. He said the parties moved from the kitchen to the living room, and once there Nicholson punched Ellsmore in the face. He said the fighting stopped and those two "made up." Another argument soon got underway, and Wallace said Nicholson hit Wallace while attempting to strike Brown. As Nicholson and Wallace stopped fighting, Wallace said he noticed blood on the side of Nicholson's shirt. Wallace said he told Brown to call 911.

Wallace said Balbirnie then approached Nicholson and stabbed him in the neck, after which Nicholson opened a door at the top of some stairs and fell down them. Wallace said he and Balbirnie followed, that Nicholson got up and headed toward a window on the first floor, and that Balbirnie then approached Nicholson. Wallace said Balbirnie put his hand on Nicholson's shoulder and then stabbed him in the chest. He said Nicholson then broke the window, jumped out, and fell into the backyard.

In total, we have three eyewitnesses who testified. Another witness, a forensic pathologist, testified that the fatal wound was a stab wound to the chest. So the question of prejudice comes down to analysis of the strength of the evidence that Balbirnie was the person who fatally stabbed Nicholson in the chest. With that evidence in mind, Balbirnie has the burden to show that his attorney's failure to introduce the recording of the 911 call resulted in prejudice to his case. See *Mattox*, 293 Kan. 723, Syl. 1.

Two of the eyewitnesses, Ellsmore and Wallace, said they saw Balbirnie stab Nicholson in the chest. Brown said she saw Balbirnie stab Nicholson in the side of his back, but she apparently left to go call 911 before the stabbing described by Ellsmore and Wallace—which happened after the three went downstairs—took place. No witness testified that anyone else stabbed Nicholson in the chest.

6

Balbirnie argues that Brown said in the 911 call that Wallace stabbed Nicholson in the chest, but during the call she never said where Wallace stabbed Nicholson. She just said that "[m]y fiancé stabbed him."

In the call, Brown was understandably quite upset. She appeared to have been crying while trying to speak; some of what she said is hard to understand. After she said her fiancé had stabbed Nicholson, the person who answered the call asked, "Okay, is your fiancé stabbed or is the other person stabbed?" That seems to indicate the somewhat confused nature of the call, and Brown didn't respond to that question.

In addition to Brown's comment about Wallace stabbing Nicholson, she also told the 911 operator generally that "they had knives stabbing people." Of course, she testified at trial and the jury got to hear her testimony from the witness stand.

There was other significant evidence against Balbirnie. In talking to police right after the event, he had denied stabbing Nicholson, but evidence at trial showed that Nicholson's blood was found on Balbirnie's bracelet and shoelace. There was also a video introduced in evidence of Balbirnie's interview at the police station. That video is not in our record, but the prosecutor said in closing argument to the jury that it showed Balbirnie wiping blood off his shoulder when no one else was in the room, reenacting a stabbing motion, and telling Wallace through a wall, " I hope I don't get told on. Just deny it, Phillip. Don't blame me."

As we noted, that video is not part of our record on appeal. But Balbirnie had the burden to show that his attorney's failure to introduce the 911 recording prejudiced the defense. On appeal, Balbirnie had the burden to present a record sufficient to support his claims of error. *State v. Kleypas*, 305 Kan. 224, 285, 382 P.3d 373 (2016). Given those

burdens, we cannot ignore the existence of the video—as described in our record—even though the video itself is not in our record.

Based on our review of the evidence, we conclude that Balbirnie has not shown a reasonable probability that the trial's result would have been different had his attorney introduced the recording of the 911 call. Since that's one of the two things he had to show to get a new trial, a new trial is not appropriate on the basis of that error by his attorney.

Earlier, we said that the issue about the omission of the 911 call recording was the primary claim Balbirnie had raised in this appeal. On page 24 of his 27-page brief, Balbirnie's attorney referenced several other claims Balbirnie had made in a motion in the district court and said "counsel would incorporate those arguments here." But that's not the way the appellate process works.

We give each party the ability to file a 50-page brief (even more with permission) so that the issues can be fully set out in the context of the appeal. And we require that each party set out in their brief "the facts that are material to determining the issues to be decided . . . keyed to the record on appeal by volume and page number" so that we can do our job of carefully reviewing the argument and the record. Supreme Court Rule 6.02(a)(4) (2017 Kan. S. Ct. R. 35). We also need a citation "to the location in the record on appeal where the issue was raised and ruled on" or, if not raised in the district court, "an explanation why the issue is properly before" us even though it wasn't raised previously. And we need "[t]he arguments and authorities relied on." Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 35).

After stating that "counsel would incorporate" arguments made in the district court, he proceeded to mention some of them—for example, that trial counsel didn't pursue additional DNA testing. But there was no citation to facts in the record that might support that claim, no citation to where the issue had been raised or ruled upon, and no

8

citation to statutes or caselaw that might support the claim. That obviously doesn't meet the minimum requirements for pursuing an issue on appeal. See *State v. Reu-El*, 306 Kan. 460, 471, 394 P.3d 884 (2017) (finding that issues raised in district court but not advanced on appeal are deemed abandoned); *State v. Logsdon*, 304 Kan. 3, Syl. ¶ 7, 371 P.3d 836 (2016) (noting requirement that appellant's brief "include pinpoint citations to the record on appeal where an issue was raised and ruled on"); *State v. Kettler*, 299 Kan. 448, 465, 325 P.3d 1075 (2014) (noting that Kansas appellate courts will not independently search the record to try to find facts that would support a party's claim); *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) (reciting rule that "[w]hen a litigant fails to adequately brief an issue it is deemed abandoned").

It's certainly not self-evident that Balbirnie has winning claims here in this brief listing of arguments made in the district court. On the DNA-testing question, his trial attorney conceded in testimony to the district court that additional testing might have produced evidence useful to the State. He said he decided not to seek additional testing rather than having a delay of the trial for several months. That's just the sort of strategic decision attorneys make in every case, and we rarely second-guess a deliberate strategic choice if the attorney has given the matter appropriate consideration. See *Strickland*, 466 U.S. at 690-91; *State v. Hargrove*, 48 Kan. App. 2d 522, 556, 293 P.3d 787 (2013).

Perhaps we could overlook all of this and try to ferret out how each of these issues might have been pursued on appeal in light of the district court's rulings, comb the 18 volumes in our record to find each piece of evidence that might support Balbirnie's position, and then look for caselaw that would allow us to resolve each point. We decline to do so. We have addressed the only issue on which Balbirnie has provided a brief that complies with the rules governing appeals and gives us the materials we need.

The district court's judgment is affirmed.

9