NOT DESIGNATED FOR PUBLICATION

No. 114,735

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

REGINALD JOHNSON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed September 1, 2017. Affirmed.

*Michael P. Whalen* and *Krystle Dalke*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., GREEN and HILL, JJ.

PER CURIAM: In this appeal of the district court's denial of habeas corpus relief, Reginald Johnson, serving a prison sentence for killing his wife, asks us to second-guess his trial attorney, rule that counsel's performance was legally deficient, and order a new trial. Johnson's complaints center on actions his lawyer took when he was executing his plan of attack on the State's case. Experience teaches us that some trial strategies work; some do not. That does not mean adopting the strategy in the first place was professionally deficient because juries consider the evidence when reaching a verdict.

1

After reviewing all of the evidence presented on this motion and at the trial, we hold that Johnson has not shown us that there is a reasonable probability that his jury would have reached a different verdict in the absence of the claimed deficiencies of his trial counsel. In fact, we are not even convinced that his trial counsel's performance was deficient. Therefore, we affirm the district court's denial of relief under K.S.A. 60-1507.

We note that this motion actually returns to this court after a panel had previously remanded the matter to the district court for an evidentiary hearing. After taking evidence on the issues, and adopting extensive fact-findings as proposed by the State, the court denied Johnson any relief.

Deeming the issue abandoned, we will not address the brief reference to physician-patient privilege in Johnson's complaints about his trial counsel's performance. He does not explain how it would be applicable, and an issue not briefed by the appellant is deemed waived or abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016).

Johnson attacks the district court's ruling primarily in four areas:

- Ken Newton, his trial attorney, was ineffective by failing to conduct an adequate investigation and not calling certain crucial witnesses to testify;
- Newton virtually forced him to testify against his will because Newton failed to call some witnesses;
- Newton should have lodged a hearsay objection at one point of the trial that would have prevented the admission of some damaging testimony; and
- Newton should have filed a pretrial motion to suppress a handwritten note.

2

And, finally, Johnson argues that cumulative errors during Newton's representation should compel us to order a new trial. We will address the issues in that order after a brief review of the rules that guide us in these types of cases.

*Relief can be granted if two factors are proved.*

For a case such as this, our primary concern is whether Johnson received a fair trial. In other words, was Johnson convicted by the evidence or through the professional incompetence of his lawyer? To prevail on a claim of ineffective assistance of counsel, a defendant must establish two things: deficient performance by the lawyer and prejudice to the defendant's case. By prejudice, we mean that there is a reasonable probability the jury would have reached a different verdict if there had been no deficient performance by the lawyer. See *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

Especially pertinent to this case is the rule that if counsel has made a strategic decision, after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. See *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013).

At the evidentiary hearing on Johnson's motion, Newton testified extensively about his trial strategy, giving explanations for why he did or did not do certain things that Johnson now complains about. We will examine his reasons in detail.

The bloody details of Johnson's crime are set out by our Supreme Court in its affirmance of Johnson's conviction and need not be repeated here. See *State v. Johnson*, 290 Kan. 1038, 236 P.3d 517 (2010). Johnson used a shotgun to shoot his wife, Amy Whiteman, at their home in Wichita. Looking back on the trial now, many years later, it

3

is safe to say that the question at trial was not whether Johnson had killed Whiteman—after all, he shot her four times with a shotgun—but was, rather, a question of his culpability. Of what degree of crime was Johnson guilty?  Or, was there any excuse for shooting his wife?

An important component of the case against Johnson centered on a handwritten note that he had given Whiteman before her murder. For the State, it was evidence of premeditation—a threat to kill if she was unfaithful. For the defense, it was Johnson's way of saying he was going to kill himself; in other words, a dramatic gesture of his depression as a result of her infidelity. For the defense, it was evidence that would support a finding of guilt of a lesser crime. How this note was handled at trial and the examination of witnesses about it are the primary areas of contention in this motion.

*After investigation, defense counsel developed a trial strategy.*

Newton and his investigator not only looked into the background of all concerned but the facts of the crime as well. Newton testified that he interviewed the lay witnesses and his investigator interviewed the doctors. The defense strategy Newton adopted was to convince the jury that Johnson's motive was suicide, not homicide, and because of the heat of the moment with passions rising, things got out of hand and he shot his wife and not himself. The goal, then, was a conviction for a lesser included crime, such as voluntary manslaughter, and not premeditated first-degree murder. Given this record, we cannot say this was a bad strategy. Neither can we say that it was unprofessionally carried out, nor was it a deficient performance. The strategy just did not work; obviously the jury was convinced from the evidence that Johnson, with premeditation, intended to murder his wife.

Because this was a defense based on motive and not factual innocence, in his preparatory work, Newton wanted to explore the psychological issues that arose from the

4

circumstances of this case. By having Johnson evaluated, Newton was able to consider possible lines of defense suggested by the professional reports of his condition.

*We explore Johnson's complaint about his counsel's limited investigation.*

Newton asked Dr. Molly Allen to conduct a psychological evaluation of Johnson. To us, Johnson argues Newton should have conducted a deeper investigation after receiving Dr. Allen's report and pursued a defense based on mental disease or defect. To provide a context, a brief review of Dr. Allen's impressions of Johnson is helpful at this point.

Dr. Allen's report discussed Johnson's depression, self-destructive behavior, and bouts of rage:

"Mr. Johnson acknowledges a history of self-destructive behavior on his part, and it appears that he has had a lot of difficulty dealing with rejection or disappointment, particularly in his relationship with [h]is wife. No doubt abandonment by his father early in life left Mr. Johnson with some insecurities. However, rather than trying to cope, adapt, and move on, he has tended to instead become overly self-focused and self-pitying, with significant bouts of depression and self destructive behavior. Thus, his accounts of sometimes having 'missing time' or brief amnesia when he is in the midst of intense interactions with his wife appear to have a lot to do with his extremely shaky sense of self. That is, Mr. Johnson defines himself as to whether or not he has control of his wife's positive attention, affection, and approval. Without it he becomes frantic, full of rage, impulsive, very distracted, and most likely experiences so much distress out of proportion to the situation that he 'shuts down' or represses to the point that memories are later unavailable to him.

"Mr. Johnson most likely has had an affective disorder, and a character disorder, the latter of which is characterized by an individual having chronically disturbed relationships with others. In Mr. Johnson's case, this means that he lacks a stable sense of self, and tends to

5

be drawn to a chaotic and dysfunctional relationship with a primary partner. In this sense, he could be said to have a mental disease or defect that contributed to the crime in question."

At the evidentiary hearing on Johnson's motion, the court admitted testimony about Dr. Allen's report on whether Newton had conducted a proper investigation, but it did not allow any testimony about whether Newton should have raised a mental disease or defect defense because that issue had not been raised in Johnson's K.S.A. 60-1507 motion. Newton testified that prior to trial, he requested the psychological evaluation of Johnson to determine the plausibility of putting on a mental disease or defect defense.

After Newton reviewed Dr. Allen's report, he chose not to proceed with that line of defense because Dr. Allen did not give a "real definitive endorsement" of mental disease or defect. After reviewing the report, he did not contact Dr. Allen about her report or findings. Newton chose a different defense. Newton did not investigate the defense of mental disease or defect any further. Newton testified that he chose not to call Dr. Allen to testify because her recommendation was not strong enough to be successful. Newton said he was looking for something more—her report seemed "wishy-washy" to him. Newton made an informed, professional choice not to pursue that defense. We are in no place to second-guess his judgement at this point.

In opposition, Johnson argues that had Newton investigated further, there is a real possibility that he would have been convicted of a lesser offense. He argues the symptoms described in Dr. Allen's report mirrored what he told the police that he experienced on the day of the shooting.

The problem with Johnson's argument is that it is too hypothetical. After all, Newton did investigate Johnson's psychological condition by having him evaluated and reviewing Dr. Allen's psychological report. Johnson does not explain how the report or

6

further investigation would have negated premeditation. There is no evidence in this record that leads us to a conclusion that a mental disease or defect defense could have been raised, other than Johnson's desire now to make it so. To obtain relief, Johnson must show us a reasonable probability that the claimed defense would have convinced his jury—not just a possibility it might work. Johnson has failed to do so.

The trial record shows ample evidence that Johnson had psychological issues and was suicidal on the date of the murder. This was introduced through other witnesses. Detective Thomas Fatkin testified that Johnson said he planned to shoot himself (not Whiteman) after he found out about the affair. Newton elicited from Lisa Sandoval and Eddie Porter on cross-examination that Johnson had suicidal ideations, as will be discussed later.

Also, the district court's finding that Jay Greeno, the attorney Johnson called to criticize Newton's performance, did not review the entire file or the trial transcript and, thus, was unpersuasive is supported by the record. Greeno could not testify to the extent of the investigation that Newton conducted or how the information about Johnson's psychological issues was used at trial. To us, Johnson has failed to raise one relevant fact that Newton's investigation failed to uncover. Certainly, Johnson has not shown us that Newton's investigation prevented him from proceeding with his planned defense or any different defense he might have reasonably raised.

*We examine Johnson's complaints about failing to call certain witnesses.*

Next, Johnson claims Newton was ineffective because he failed to call several witnesses. We look first at the possible testimony of Dr. Roxann Dicker, Johnson and Whiteman's family therapist and marriage counselor.

7

Newton testified that he chose not to call Dr. Dicker because she had not seen Johnson in at least six months, "so her testimony wasn't current enough to offer us any assistance in what would have happened two to three months later." Newton testified that it "was pretty obvious when we talked to her she didn't like [Johnson] very much and so there was a concern that she would offer some negative testimony, in addition. I think she did intimate to us that she thought he had a rage disorder and explosive behavior." Dr. Wayne Burns, Johnson's psychotherapist, later confirmed that Dicker had referred Johnson to him, in part, because of her belief that Johnson had anger issues.

Dr. Dicker did not testify at the K.S.A. 60-1507 motion hearing. The district court found that Newton was not deficient for failing to call Dr. Dicker as a witness at the trial, in part because Newton believed Dr. Dicker would have testified that Johnson had a rage disorder and explosive behavior. Such testimony would not have supported the defense but would have supported the State's theory of guilt, instead. The court's findings were supported by the testimony at the hearing. Based on the testimony provided, Newton's decision to not call Dr. Dicker was reasonable for fear that her testimony would hurt the defense.

Next, Johnson argues that if Dr. Burns had testified, he would have explained that:

- Johnson's anger issues were from frustration;
- Johnson had dysthymia (a persistent depressive disorder); and
- Dr. Burns did not see any signs of violence in Johnson.

At the motion hearing, Newton testified that he chose not to call Dr. Burns to testify at trial because he wanted to keep out information in Dr. Burns' report that indicated Newton had a rage disorder. Newton was concerned that if he called the doctor, his testimony would actually help establish premeditation or at least provide a motive to

8

kill. While it is true that Newton did not interview Dr. Burns, his investigator did. Newton was well aware of Dr. Burns' statements about Johnson's issues with depression.

At the motion hearing, Dr. Burns testified that he was a psychotherapist and Johnson was his patient in 2007, referred to him by Dr. Dicker due to suicidal ideation, depression, and anger issues. During his sessions with Johnson, Dr. Burns did not see the anger issues present themselves. He explained that anger is always a secondary emotion. Johnson was dealing with a lot of frustrations and internalizing a great deal. His frustration had to do with some familial issues. But Dr. Burns never saw any signs of Johnson being violent towards others. Dr. Burns was just getting ready to delve into the potential anger issues when the therapy sessions stopped. Dr. Burns never saw any indication that Johnson was suicidal or had homicidal ideations in his three visits. Dr. Burns diagnosed Johnson with dysthymia.

Concerning Dr. Burns' evidence, the district court found that Newton's representation was not professionally unreasonable. Newton had already investigated Johnson's mental health. He reviewed Dr. Burns' report. He had Dr. Allen evaluate Johnson before trial. Newton made a strategic decision not to call Dr. Burns to testify after a reasonable investigation. In addition, the court found that Dr. Burns' testimony would not have had the desired effect:

> "While it is true that Dr. Burns said that [Johnson] did not present any anger issues as a primary emotion or homicidal ideations, he also indicated that the diagnosis was based on the limited input given by [Johnson]. [Johnson] purports to have had suicidal ideations when talking to other people, but denied suicidal ideations in his three meetings with Dr. Burns. This revelation would have undermined defendant's defense and his credibility at trial. This is the type of damaging testimony that Mr. Newton was trying to avoid by not calling Dr. Burns."

9

We find that reasoning persuasive. The trial court's findings are supported by substantial competent evidence. Based on Dr. Burns' testimony at the motion hearing, it was unclear how his testimony at trial would have helped the defense. His testimony at the motion hearing certainly did not support the defense theory that Johnson was suicidal. It was reasonable for Newton to make the strategic decision not to call Dr. Burns to testify to avoid the "anger issues" testimony altogether. We now turn, briefly, to an issue raised about medical records.

Johnson complains that Newton did not review Johnson's medical records from the Good Shepherd clinic. Johnson argues those records supported his claim that he was suicidal. On this point, Newton testified that he did not recall reviewing Johnson's medical records from his stay at Good Shepherd. But he talked to Johnson about what he experienced there. Johnson told Newton that he had issues with depression and suicidal thoughts. When it addressed this issue, the district court found that other evidence, including Sandoval's testimony, showed Johnson was suicidal at times, and not necessarily homicidal.

The trial court is correct. Newton knew about Johnson's Good Shepherd stay and that Johnson was suicidal. Newton elicited testimony at trial from both Sandoval and Eddie Porter to that effect. Specifically, Newton asked Sandoval:

"Q.     And, um, you knew that Amy was concerned that Reggie finding out might cause him to hurt himself.
                Isn't that correct?
"A.     Yes.
"Q.     And by hurting himself, he may react and take his life?
"A.     Yes, that was Amy's concern.
"Q.     And Amy confided in you the fact that he had been in and out of the Good Shepherd Hospital?
"A.     Yes.

10

"Q.     For suicide attempts in the past?

"A.     Yes."

Thus, whether Newton had read the Good Shepherd medical records, his cross-examination shows that he had investigated the matter. We see no reason to grant relief to Johnson on this point. We now return to the final two witnesses Johnson says Newton should have called.

*Lisa Sandoval testified at trial about Johnson's note to Whiteman.*

Without being specific, Johnson argues that Newton should have interviewed Sandoval, Whiteman's coworker, prior to trial and if he had, Newton would have learned information that could have corroborated Johnson's defense. We take a closer look at that later.

The State called Sandoval to testify at trial. The State asked Sandoval if Whiteman had confided that she had received written communications from Johnson during the month of August. She testified then about a specific note:

"Q.     Can you tell us about that, please?

"A.     Um, one day she came to work.

Um, and every morning she had to pass my desk as she would come in the door. And I would ask her, How are you doing today. And on one particular day, and I don't know the date exactly, um, she said, I've been better. You're not going to believe what I found this morning. And she said she had found a note from Reggie on the table.

"Q.     Did she show you the note?

"A.     She didn't show me the note, I saw she had it in her hand. And she laid it on the desk.

"Q.     So you saw it?

"A.     Yeah.

"Q.     And did she talk to you about its contents?

11

"A.     Um, yes. She said, um, that, oh, my gosh, what am I going to do now? Reggie
        left this note. And he said that if he ever found out I was cheating on him, he was
        going to kill me.

"Q.     And did she appear concerned about that, I mean?

"A.     No, not really.

. . . .

"Q.     So the note is out there, she's telling you about that?

. . . .

"Q.     So that evidenced some concern; right?

"A.     Yes.

. . . .

"Q.     Was it a threatening letter?

"A.     She took it as—no.

        MR. NEWTON: I'm going to object, Your Honor, as to her state of mind.

        THE COURT: Your response, Ms. Swegle.

        MS. SWEGLE: Let me try to rephrase the question.

"Q.     . . . Characterize the degree of concern she showed, if any?

"A.     Um, I didn't notice any. It was just more of a frustration, like, what now. Another
        complication I guess to the several complications that she already felt she was
        involved in.

"Q.     So there were continuing problems with Reggie; is that right?

"A.     Yes.

"Q.     And now he's going to kill her if he finds out she's cheating?

"A.     Yes."

After the note was admitted into evidence, the State asked Sandoval to read a portion. Sandoval read, "Warning, if you hurt me again, promise, I will hurt back in the worst way." The letter continued, "Enough is enough."

On cross-examination by Newton, Sandoval testified that Whiteman's concern was that Johnson may take his own life. Newton asked Sandoval if Whiteman ever expressed a fear of Johnson. Sandoval responded, "Never." Newton asked, "Isn't it fair to say that

12

the only fear that she expressed was the fact that Reggie might do something to himself?" Sandoval responded, "Correct."

At the motion hearing, Sandoval testified that neither Newton nor his investigator ever got in touch with her. Sandoval testified that at trial, she was not permitted to explain Whiteman's comment that if Johnson found out about her affair, he was going to kill her. At the motion hearing, Sandoval testified that it was a figure of speech. And Whiteman was never worried about Johnson harming her. Whiteman told Sandoval she was not afraid of Johnson. Sandoval complained that the jury did not hear the full explanation of what Whiteman meant by the statement. Sandoval testified that if Newton had interviewed her prior to trial, she would have explained this to him.

Newton testified that he believed Johnson's statement of "I will hurt back in the worst way" had a special meaning between only Johnson and Whiteman, so only Johnson could testify that it meant he would commit suicide. In contrast, Johnson testified that he had told Newton before trial that several people knew the meaning of this statement. But Johnson did not know that Sandoval was aware of his issues until she testified at trial.

On this point, the district court found that Newton's representation was not deficient because the trial transcript showed that Sandoval presented favorable testimony on direct examination and Newton elicited testimony favorable to the defense during Sandoval's cross-examination.

Was it unreasonable for Newton to fail to interview Sandoval prior to trial? In hindsight, probably yes. But to properly assess counsel's performance, caselaw calls for us to eliminate the "distorting effects of hindsight and reconstruct the circumstances of counsel's challenged conduct." *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006). There is no indication that either Newton or Johnson knew before trial that Sandoval could have explained Johnson's statement of "I will hurt back in the worst way" in the

13

way she did at the motion hearing. Knowing what we know now, we can say that Newton should have interviewed her. But we question how damaging to Johnson's defense his failure to talk to her was because of how Newton handled her evidence at trial. Through Newton's questions, Sandoval told the jury that Whiteman was not concerned for her own safety but concerned about Johnson hurting himself, instead.

The trial court's findings on this point are supported by substantial evidence. Newton elicited favorable testimony during his cross-examination of Sandoval. He got Sandoval to say that Whiteman's concern was that Johnson may hurt *himself*. This admission supported Johnson's defense. Newton's representation was not objectively unreasonable.

*Eddie Porter testified at trial about Johnson's thoughts of suicide.*

Johnson contends that Newton should have interviewed his friend Eddie Porter prior to trial and called him as a witness. He argues that Porter was aware of Johnson's medical history and would have testified that he was not concerned about Johnson hurting Whiteman but that Johnson may hurt himself.

Porter did testify at trial. On cross-examination, Newton asked Porter if he had concerns after telling Johnson that his wife was cheating on him. Porter said he had "big concerns." His concern was that Johnson was going to "do some harm to himself." By harm, Porter meant "probably shoot himself." Porter was concerned Johnson would take his own life. Porter had some knowledge that Johnson had been suicidal in the past. Newton asked Porter if he was concerned that Johnson was going to harm Whiteman. Porter responded, "Not at all." Johnson told Porter that he was going to let Whiteman be with the other guy and he would try to move on.

14

In its review of this point, the district court found Newton's representation reasonable because he had elicited helpful testimony on cross-examination. The trial court is correct. Porter's testimony at trial supported Johnson's story that Whiteman was not concerned with Johnson hurting her and that Johnson was suicidal. Newton was prepared to cross-examine Porter and did so effectively. Newton was not ineffective is this regard.

To summarize, this record clearly discloses that Newton gave specific plausible reasons for his actions based on the trial strategy he had adopted of suicide as a motive, and not homicide. He conducted a pretrial investigation, called several witnesses at trial, and explained why he did not call the witnesses Johnson now lists. In his view, Dr. Allen's report was not strong enough to pursue a mental illness or diminished capacity defense. He did not call Dr. Dicker to testify because she did not like Johnson and believed that he exhibited anger issues and was explosive. Dr. Burns' testimony about not detecting any suicidal ideations from Johnson would have completely undercut the core of the defense. The admission of the Good Shepherd medical records would have had little impact because testimony about Johnson's depression had already been admitted at trial. While he did not call Sandoval, Newton was able to elicit favorable testimony from her at trial about Whiteman not being fearful of Johnson. And, finally, Porter did testify and, through Newton's cross-examination, told the jury about his fears of Johnson harming himself and not Whiteman. In other words, the information helpful to the defense came in and many unhelpful statements did not. These actions are not examples of incompetence. We will not second-guess the defense strategy here as Johnson asks us to do. We hold that Newton's performance was not deficient.

*We are not persuaded that Johnson was compelled to testify against his will.*

Johnson's and Newton's testimony differed on this point at the motion hearing. Johnson contends that he told Newton before trial that he did not want to testify, but he

15

felt compelled to because Newton told him it was necessary to explain Johnson's handwritten note and Newton did not call other witnesses on his behalf. Johnson said he had no plans to testify because "the golden rule is not to take the stand" in a murder trial. According to Johnson, after the State rested, Newton told him that he needed Johnson to testify to bring out a few points about the note. Johnson told him again that he did not want to testify. But Newton said that if Johnson did not testify "with those letters being produced, there's a good possibility that you will be convicted of first degree." So he unwillingly agreed to testify because Newton did not call other witnesses.

A totally different picture is drawn by Newton, who testified that it was Johnson's desire to testify. "He expressed that long before the trial and we discussed that long before the trial." Newton testified the "strategy" was for Johnson to testify. Johnson sat through the whole trial and made the choice to testify. Newton testified that Johnson had told him that the handwritten letter had a special meaning between only him and Whiteman. Newton believed only Johnson could explain that special meaning to the jury. A quick review of the trial transcript is helpful on this point.

In the State's opening statement, the prosecutor mentioned that Whiteman had received a threatening note from Johnson that stated he would "hurt back [Whiteman] in the wors[t] way" if he found out she was cheating on him. In his opening statement, Newton talked about the note:

> "[Y]ou're going to hear evidence that that had a special meaning between him and Amy. And that was, that the wors[t] way Reginald Johnson could hurt Amy, was not taking her life, but by taking his own. And making her look into the eyes of their 10-year-old son, Josiah, and explaining to him why daddy is no longer with us. That's how he would hurt her in the wors[t] way possible. She would have to live with what she did."

After the State rested, Newton asked the trial judge to talk to Johnson about his right to testify. The court told Johnson that:

16

"[N]o one can make you testify, that choice is yours and yours alone.

"There are a lot of decisions that your lawyer can make for you during the course of the trial, but this is not one of those decisions. This is one that's solely up to what you want to do.

"I hope that you do talk to your lawyer about this, and listen to your lawyer's advice. But ultimately the decision is completely up to you."

Johnson testified at trial, as planned. With regard to the handwritten note, Johnson explained that "the wors[t] way" to hurt Whiteman was to take his own life so that she would "have to look my son in his eyes and explain to him why his daddy isn't here any more." The statement had that particular meaning between him and Whiteman. Thus, Johnson put his defense squarely before his jury.

It was then during cross-examination that the State asked Johnson if he had discussed anger management issues with Dr. Burns. The State asked Johnson to read a record of his initial interview with Dr. Burns that said Johnson had "significant anger management issues." This was damaging to Johnson's defense, undercutting his claims of depression and suicide. He cites that damage to us as a reason for us to order a new trial.

At the motion hearing, Johnson testified that he explained to Newton that Drs. Dicker and Burns could corroborate his meaning in the note. Johnson asked Newton to contact them because they could verify the "true meaning" of his statement. During the hearing, Johnson claimed that if Dicker or Burns had testified at trial and explained what he meant by hurting Whiteman in the worst way, then he would not have had to testify at trial. In response, Newton testified that while he did not call any witnesses to corroborate Johnson's testimony, there were witnesses called that did corroborate Johnson's testimony.

The district court discounted Johnson's testimony at the motion hearing on this point, essentially finding Newton more credible. The court noted that the trial record

17

showed the trial court expressly informed Johnson it was "his decision alone" whether to testify. The court also noted that it would be inadmissible hearsay for other witnesses to testify about what Johnson told them unless Johnson testified.

Obviously, Newton's testimony at the motion hearing directly contradicted Johnson's testimony. We cannot legally reweigh the testimony or pass on the credibility of witnesses and will not try to do so now. See *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). If it was Johnson's decision to testify, as he told the trial court, then Newton cannot be ruled deficient for calling Johnson to testify.

*Counsel gave a reasonable explanation for not objecting to hearsay.*

The panel that remanded this case to the district court for an evidentiary hearing questioned the lack of a hearsay objection during Sandoval's trial testimony. With no evidence to evaluate, the panel stated it could not judge whether the lack of an objection was deficient:

> "As we have indicated, the hearsay character of the statement raises legitimate concerns about its admissibility and, more pertinently here, the failure of Johnson's trial lawyer to lodge an objection. We have no way of knowing why the lawyer passed on making an objection, since the district court declined to hold an evidentiary hearing on the 60-1507 motion." *Johnson v. State*, No. 109,169, 2014 WL 1362929, at *5 (Kan. App. 2014) (unpublished opinion).

On remand, when asked if there was a reason why he did not object to Sandoval's testimony, Newton testified that Johnson wanted other favorable hearsay statements to come in:

> "All I could say is at the time Mr. Johnson was wanting other statements to also come in from Amy that were helpful to him, such as she wasn't afraid of him. She went along with

18

him voluntarily. Those were other statements that he specifically wanted to get into evidence and my thought was that if we start objecting to hearsay early on, the judge is going to shut us all down and we will not be able to prove those points that Mr. Johnson wants to prove."

Newton wanted Sandoval to testify that Whiteman was not worried that Johnson was going to hurt her because it would negate premeditation.

We now have the evidence the prior panel wanted. Newton did not object to the hearsay testimony because there was other hearsay testimony from Sandoval that was beneficial to the defense:

- Whiteman was not afraid of Johnson;
- Johnson was suicidal;
- Whiteman loved Johnson; and
- Whiteman stayed with Johnson voluntarily.

Again, this is an example of Newton's strategic thinking.

Johnson contends that there is no rule that prohibits Newton from objecting to Sandoval's harmful hearsay testimony if Newton failed to object to Sandoval's helpful hearsay testimony. He argues that Sandoval's testimony supported the State's theory of premeditation and, thus, significantly prejudiced the outcome of the trial. But now we are approaching the subject of trial tactics. Johnson is basically criticizing Newton for his choice of trial tactics.

The caselaw tells us where experienced attorneys might disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective counsel. But the strategy must be objectively reasonable. See *Bledsoe v. State*, 283 Kan.

19

81, 93-94, 150 P.3d 868 (2007). If no competent attorney would have adopted the strategy, it falls below minimum constitutional standards. *Wilson v. State*, 51 Kan. App. 2d 1, 15, 340 P.3d 1213 (2014). Because we have already found that the trial strategy Newton adopted was sound, we hold the tactic Newton followed here of not objecting to hearsay testimony to have favorable hearsay testimony admitted is not ineffective.

We reiterate. In the handwritten note, Johnson wrote, "Warning, if you hurt me again, promise, I will hurt back in the worst way." To corroborate Johnson's claim that he was writing about suicide rather than homicide, Johnson's attorney needed to elicit hearsay testimony. The jury may well have taken Johnson's written statement as a threat to Whiteman's life without Sandoval's hearsay testimony to the opposite. A federal case supports our view.

In *United States v. Martinez*, 276 Fed. Appx. 741, 746-47 (10th Cir. 2008) (unpublished opinion), a defense attorney faced a similar problem. The 10th Circuit rejected a claim of ineffective assistance of counsel when the attorney failed to object to damaging hearsay testimony to utilize helpful hearsay testimony. The court stated:

> "As Kaufman explained to the district court, he did not object because he had opened the door to Ambers's statements while cross-examining Officer Jensen. Kaufman apparently pursued that strategy because there was no other way to put Ambers's self-incriminating statements before the jury. . . . The problem faced by Kaufman was that the evidence strongly favored guilt. To obtain any favorable evidence, he needed to elicit hearsay, even though this effort would likely lead to the introduction of additional unfavorable evidence. We conclude that Kaufman's failure to object when Officer Jensen provided damaging hearsay testimony was a necessary consequence of a trial strategy designed to utilize helpful hearsay testimony. [Citation omitted.]" 276 Fed. Appx. at 747-48.

Here, Newton had a similar strategic reason for not objecting to Sandoval's hearsay testimony—so he could get Sandoval to testify on cross-examination that

20

Whiteman's only concern was that Johnson would hurt himself. Thus, we hold that Newton's representation was not deficient. The first stage of the test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), is not met so there is no need to analyze the prejudicial effect of the testimony.

*Since Newton objected to the admission of the note, not filing a pretrial motion to suppress is not an example of deficient performance.*

At trial, the State moved to admit the handwritten note when questioning Whiteman's work supervisor. Newton objected on foundation grounds. The court ruled that the letter would not be admitted at that point. Later in the trial, while questioning Sandoval, the State again moved to admit the handwritten note. Newton again objected, arguing that the State still had not laid the proper foundation to authenticate the note. The trial court overruled the objection and admitted the letter.

Here, Johnson contends Newton was ineffective because he failed to file a pretrial motion to suppress the handwritten note. He argues Newton did not make a strategic decision to address the matter at trial as opposed to pretrial. He argues that if Newton had addressed the matter pretrial, he would have been more prepared during the trial to deal with its admission. But Johnson fails to show us how the outcome would have changed.

At the motion hearing, Newton testified that he did not have any issues he wanted to raise before trial. He testified that the admission of the note was "one of the issues that just kind of reared its head during the trial." The trial court found that it was not relevant that Newton could have challenged the admissibility of the handwritten note pretrial because Newton objected to its admission during the trial, which was ultimately overruled.

21

The trial court is correct. While it is true that Newton may not have had a strategic reason for failing to move to suppress the note pretrial, Johnson has not shown us that such a failure constitutes deficient performance. Newton designed his defense strategy to mitigate its effect if the note was admitted at trial. There was no prolonged discussion of the note, thus giving it increased significance to the jury because Newton lodged a simple objection. Newton said only, "I'm going to object. She's still not laid the proper foundation. And I believe the foundation provided by the [S]tate is insufficient to authenticate the letters." The court overruled the objection, and no more attention was drawn to the note by any further objection. Also, we must point out that Johnson has not established prejudice. Ultimately, the court ruled the note admissible, and Johnson has not persuaded us that a pretrial motion to suppress would have been successful in keeping it out when his objection during trial did not.

Finally, having found no deficient performance on Newton's part, there are no errors by counsel to accumulate and thus, there is no need to address Johnson's claim of cumulative error.

From this record, we find that Newton conducted a reasonable pretrial investigation on behalf of his client. Exercising his professional judgment, he chose not to pursue a defense of mental disease or defect and gave plausible reasons for his choice. Newton formulated a trial strategy of "suicide-not-homicide" as his client's motive and called witnesses to give evidence that supported that strategy. Through cross-examination, he was able to elicit favorable evidence from two witnesses that Johnson now argues he should have called for the defense. Johnson has not convinced us that Newton's performance was deficient. Also, Johnson has not shown us how his case was prejudiced by Newton's representation. He is not entitled to habeas corpus relief.

Affirmed.

22