NOT DESIGNATED FOR PUBLICATION

No. 123,311

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MARK LEWIS GLASGOW,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Clark District Court; E. LEIGH HOOD, judge. Opinion filed April 1, 2022. Affirmed.

*Morgan B. Koon*, of Koon Law Firm, of Wichita, for appellant.

*Joseph H. Milavec*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., HILL and ISHERWOOD, JJ.

PER CURIAM: Mark Lewis Glasgow appeals the summary denial of his K.S.A. 60-1507 motion after his 2014 conviction of rape of a child under fourteen. Glasgow argues he received ineffective assistance of trial counsel, postconviction counsel, and appellate counsel. Finding no error, we affirm.

*Summary of Trial Proceedings and the Victim's Allegations*

The State charged Glasgow with rape of a child under 14 under K.S.A. 2012 Supp. 21-5503(a)(3), (b)(2), based on allegations his then 13-year-old daughter, S.G., had

1

reported in July 2013. S.G. claimed that while on a drive with Glasgow and his one-year-old son, Glasgow forced her to take her shorts off and threatened to kill her, her mother (Mother), and her stepfather (Stepfather) if she did not comply. Glasgow then touched the inside of S.G's vagina.

Because Glasgow and Mother divorced several years before the incident occurred, they lived in separate cities and shared custody of their two daughters, S.G. and her then 16-year-old sister, K.G. The girls sometimes stayed with Glasgow in an agreed visitation arrangement. The rape occurred in June 2013, during one of these visits.

S.G. first disclosed the incident on July 5, 2013, during the early stages of a custody battle between Mother and Glasgow over K.G. Several weeks before the incident, K.G. had asked to move in with Glasgow. And around July 8, 2013, Glasgow moved for custody of K.G.

S.G.'s first disclosure was a couple of days after she had returned to her primary home at Mother and Stepfather's house, about one or two weeks after the incident. According to Mother, S.G. had a nightmare while napping on the couch after some Fourth of July weekend festivities. S.G. began, "screaming, crying, kicking, [and] fighting with the couch." As Mother tried to wake S.G., she stated, "[h]e hurt me momma, he hurt me," then described the rape to Mother, who contacted police. Mother did not notify Glasgow of S.G.'s disclosure.

About a week after Mother reported the incident to the police, Deputy Jamie Peralta contacted Mother, obtained Mother's statement, and interviewed S.G. At Glasgow's trial, Peralta gave this testimony about S.G.'s allegations:

> "[S.G.] said that her and her father had gone out because Mark Glasgow had asked if she
> wanted to go to the lake and that he would let her drive. Being a young teenager, she said

2

that she liked driving so she went out with him and they drove up County Road 20, which takes you up to the lake from Ashland. They got there, she said they drove around for approximately 15 to 20 minutes. And as they were driving around, she doesn't remember exactly where it was, but she described it as the southeast corner—or the southeast part of the lake around the dam, she said that she remembers going down a very steep hill. When she got there, [Glasgow] had asked her—or told her to shut the car off.

. . . .

"She said that once she got there and that they had parked, [Glasgow] had told her to pull her pants down. [S.G.] said that—as [S.G.] was saying this, [S.G.] began to—her demeanor was starting to change. She was getting really upset, kind of closing herself and guarding herself, became really emotional, crying. She said that she asked him why and that [Glasgow] had told her that she had brought this on herself because of the way she dresses wearing spandex and sport bras all the time.

. . . .

"[S.G.] stated that [Glasgow], after she questioned why, [Glasgow] told her that she better do it otherwise he was going to kill her, [S.G.], and her mother. [S.G.] said that she was afraid that he would do this so she pulled her . . . shorts and underwear down.

. . . .

"She said that she was wearing white and black Nike running shorts and a gray cut-off t-shirt.

. . . .

"She was a little confused on the date, but she believes it was around the 26th or 27th of June, 2013.

. . . .

"[S.G.] said that after she pulled down her shorts, that [Glasgow] was in the front passenger seat and had supported himself with his left hand on the center console, reached over with the right hand and then touched her.

. . . .

"[S.G.] said that she was real emotional and began to cry, and she leaned her head back and was crying but she said that at one point she did look down while this was happening and seen [*sic*] the palm of Mark Glasgow's hand, which had a burn on it, and that's what she remembers seeing when she looked down.

. . . .

3

"She referred to it as her private area. And when [Deputy Peralta] asked her what she meant by that, she again started crying and she stopped talking for a few minutes and then asked if she could tell her mother where he had touched her. [Deputy Peralta] asked her if she could just tell [him], it would be easier, and she said below her waist.

. . . .

"After [Peralta] asked her to describe more of what had happened and [S.G.] said that as he was doing this, [Peralta] asked her if she knew what it was, she began crying and stated that she did not want to know.

. . . .

"She said that she had heard from friends in school that it was called being fingered. She started crying again, uncontrollably, and saying that she does not want to understand this. She didn't want to know what that was and didn't want to understand it. [Deputy Peralta] asked her at that point if there was any penetration and . . . she said: Oh, yeah, it felt like his whole hand.

. . . .

"[S.G.] began crying again and said that it was very painful, and she said—described the pain as somebody grabbing her skin and stretching it.

. . . .

"After this, [S.G.] said that she was crying and was hoping that this was a bad dream and that she just wanted to ball up and cry and she wanted her mother. [S.G.] said that after [Glasgow] stopped touching her vagina, that he had reached over and grabbed her chest. [Peralta] asked her what she meant by her chest or what part and she said: My boobs.

"After that, [S.G.] said that [Glasgow] told her that you better not tell anybody or I will kill you and your mother. [S.G.] then pulled her shorts back up and [Glasgow] drove the rest of the way because she had a [softball] game." (R. IX, 192-97.)

S.G. also described the incident during a forensic interview with Terri Trent, a social work specialist for the Kansas Department for Children and Families (DCF). Trent recorded this interview, and the State presented the recording to the jury at trial. In her trial testimony, Trent described S.G.'s demeanor during the interview and provided general reasons why S.G. had trouble recalling specific details surrounding the incident. In part, Trent explained that it was common for victims of sexual abuse to have difficulty

4

recalling specific details or to purposefully suppress memories surrounding such traumatic events.

Leigh Schoen, a nurse practitioner in internal medicine and pediatrics, performed a non-acute sexual abuse examination on S.G. around a month following the incident. Schoen did not find any evidence of physical abuse during the examination but she did not expect to find such evidence because she did not generally discover it by this of examination. She also explained that it was "very well accepted in medicine that the majority of child sexual abuse exams would be normal."

Along with the testimony and evidence already described, the State elicited testimony from Peralta regarding two interviews he conducted with Glasgow before trial. Peralta did not record the interviews but relied on his report of the interviews in describing the events.

Some of Peralta's testimony suggested Glasgow volunteered information implicating himself before Peralta confronted him with S.G.'s specific allegations. Peralta testified that at the beginning of the first interview, he had asked Glasgow whether he knew why he had been asked to speak with him at the Sheriff's Office. Glasgow answered that it was probably related to his custody battle and that Mother "was just trying to make him look bad." Peralta then asked Glasgow, "what had happened on the trip to the lake?" Peralta described Glasgow at this point as "showing that he was getting nervous about what [they] were going to talk about." And Glasgow responded, "I have never hurt my children or done anything sexual with my children." Glasgow acknowledged that he had recently taken S.G. to the lake, but he claimed he had simply taken her there to teach her to drive before returning to town about 20 minutes later, after remembering she had a softball game. Peralta had not told Glasgow about S.G.'s allegations of sexual abuse before he made these statements.

Peralta also testified that after confronting Glasgow with S.G.'s allegations, his demeanor changed—he "kind of looked down and . . . he was starting to breathe a little bit heavier. And . . . he was kind of quiet for a second and [then] he said he's never done anything sexual to any of the daughters." Glasgow then stated that "he would never do anything sexual with his children and that even if he had tried to pull down her panties, . . . that [S.G.] would put up a fight." Peralta told the jury he noted scarring on Glasgow's right hand, which coincided with details S.G. had given during her interview.

At the second interview, Peralta provided Glasgow *Miranda* warnings—which Glasgow waived—and told Glasgow S.G. had submitted to a forensic interview and a medical examination. Peralta testified that Glasgow became angry and contended that a medical examination could not detect penetration. Glasgow also accused Peralta of lying and manipulating the situation. Glasgow claimed he did not become sexually aroused by his children, and stated, "just look at [K.G.], she's the older guys' magnet." Glasgow then requested an attorney and terminated the interview.

*Glasgow's Defense at Trial*

Glasgow testified on his own behalf and called his current wife in his defense. As a part of his defense, Glasgow claimed S.G.'s disclosure to Mother was not credible, in part because it had been made during a dream. Mother acknowledged that S.G. was not fully awake when she had told her about the incident. Glasgow implied that Mother had relied on S.G.'s disclosure to try to prevent Glasgow from getting custody of K.G. He also elicited testimony from Mother showing she preferred that K.G. not move in with Glasgow. Mother agreed that S.G. generally favored Stepfather over Glasgow.

In her testimony, Glasgow's current wife described S.G. and Glasgow's relationship as fine at first but claimed it progressively worsened throughout the months before the incident. According to her, S.G. called Glasgow in January 2012 and "told him

6

she hated him and wanted nothing to do with him." She also testified that S.G. was present when Glasgow talked to K.G. about filing for custody. She said that S.G. incorrectly stated the lake drive occurred on June 26, when she believed it happened on June 17. And she pointed out that S.G. did not act differently toward Glasgow after returning from the lake and that S.G. planned to return to Glasgow's home after spending the Fourth of July weekend with Mother.

Glasgow also testified that S.G. knew he planned to get custody of K.G. and felt she acted "like a spy" during the summer visit. Glasgow maintained that Mother manipulated S.G.'s opinion of him and that S.G. "ha[d] motives" to lie about the incident. But when asked on cross-examination what those motives might be, Glasgow answered, "I don't know her motives, I'm not her."

Mother admitted that she knew K.G. wanted to live with Glasgow before S.G. made her disclosure. But Mother did not think Glasgow would follow through with steps toward taking custody of K.G. until she was served notice of Glasgow's custody motion between July 8 and July 15, 2013, after S.G.'s July 5th disclosure.

S.G. admitted that she was sick of going back and forth between her parents' houses and that she did not like visiting Glasgow. She considered Stepfather her dad and preferred him over Glasgow. Still, she maintained that she testified truthfully and that she did not make up the incident to prevent Glasgow from getting custody of K.G.

*Conviction and Sentence*

The jury convicted Glasgow of rape of a child under K.S.A. 2012 Supp. 21-5503(a)(3), (b)(2).

7

Glasgow hired new defense counsel (Linda Eckelman) before sentencing. He then moved for a dispositional departure, arguing:

- His crime did not involve "extreme sexual violence" warranting a life sentence;
- He received ineffective assistance of counsel; and
- The State presented insufficient evidence.

At his sentencing hearing, Glasgow, again argued that his trial counsel, Louis Podrebarac, had provided inadequate assistance:

> "I was not represented well in this trial. I was railroaded. And I feel like my life is just screwed up because a little girl wants to lie about something because she's mad at me because I had the gall to take her sister that wanted to come live with me. And none of this came about until after that fact."

The district court denied Glasgow's motion for a dispositional departure and sentenced Glasgow to the presumptive term of lifetime imprisonment with the possibility of parole after 25 years.

*Postconviction Proceedings and Direct Appeal*

Glasgow filed a direct appeal from his sentence and conviction and moved for a remand to district court so it could address his ineffective assistance of counsel claim. We granted Glasgow's request and remanded for other proceedings under *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 2, 716 P.2d 580 (1986).

At the *Van Cleave* hearing, Glasgow challenged Podrebarac's representation based in part on his handling of:

8

- false physical abuse accusations Glasgow said S.G. had made years before;
- K.G.'s allegations of sexual abuse by Stepfather;
- a threat Glasgow claimed Mother had made, promising to punish Glasgow for his involvement in K.G.'s allegations against Stepfather; and
- information related to Peralta's alleged firing from the Sherriff's Office.

Glasgow and Podrebarac testified at the evidentiary hearing. Glasgow testified that Podrebarac was ineffective because he did not properly attack S.G.'s credibility at trial or inform the jury that S.G.'s accusations were simply a part of "a constant in-fighting child custody crusade." Glasgow claimed that S.G. made false allegations of physical abuse against him and that one day, "out of the blue," DCF appeared at his house to investigate her report that Glasgow had broken her wrist. But according to what K.G. told Glasgow, S.G. had injured her wrist at school. Glasgow said that DCF eventually cleared him of S.G.'s accusation and he sent Podrebarac the "paper from [DCF] that said that [he] didn't do it."

Glasgow also testified that Podrebarac knew that K.G. had accused Stepfather of molesting her two years before this case began and that Glasgow had reported her accusations to the Sheriff's Department in Norton, Kansas. And Mother allegedly threatened to "get back at" Glasgow for his involvement in K.G.'s report against Stepfather.

Glasgow testified that he filed for custody of K.G. on July 3, 2013, and told Mother of that filing on July 4, 2013, the day before S.G. made her initial disclosure. Glasgow also claimed he had given Podrebarac a list of witnesses who could establish that Mother and S.G. conspired against him to punish him for obtaining residential custody of K.G., but Podrebarac did not subpoena any of those witnesses. Although Glasgow believed those witnesses could testify that he was a good person and parent, he acknowledged that Podrebarac had advised him against calling character witnesses

9

because that would allow the State to admit evidence of his prior conviction for sexual battery.

Podrebarac testified that he had nearly thirty years of legal experience and spent around 33 hours on Glasgow's case. His theory of defense was that S.G. made the allegations up and the parties used "a dream as a vehicle to make this story up." Podrebarac did not hire an investigator because he did not believe it would assist his theory of defense. But Podrebarac hired an expert to examine S.G.'s forensic interview and to review the procedures used in questioning S.G. The expert did not find any evidence of improper interviewing conduct.

Podrebarac also acknowledged that he did not issue any subpoenas for Glasgow's trial because he did not "see any witnesses that would be helpful." Podrebarac decided not to call any impeachment witnesses to rebut S.G.'s testimony because he believed S.G.'s trial testimony would not be credible or consistent with information she had given during her forensic interview. Podrebarac believed he could attack S.G.'s credibility based on her inconsistent statements about dates and other details surrounding the incident.

Podrebarac explained that although Glasgow had told him that S.G. had made a false physical abuse report, he did not believe the information helped his theory of defense. Although Podrebarac had tried to subpoena records from S.G.'s school before Glagow's preliminary hearing, he dropped the matter after learning the school had never received the subpoena. Podrebarac decided not to pursue the matter because S.G. denied that she had ever made such an allegation at the preliminary hearing.

Podrebarac also testified that he lacked justification to file a motion under *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979), to examine S.G.'s ability to tell the truth:

10

"I believed that we did not have sufficient criteria to have her examined as a complaining witness in the sex offense case. There are some things that fit with the criteria in terms of her reporting this: No witnesses, no physical evidence. But I don't believe we had any mental illness to have her examined."

Podrebarac knew that K.G. had accused Stepfather of sexual abuse, but he could not recall whether DCF had investigated the matter. He knew that Glasgow had started a custody case for K.G. and he had reviewed a copy of a transcript from those proceedings, but Podrebarac did not admit any portion of that transcript at trial. Still, Podrebarac based some of his trial questioning on the custody matters so the jury heard evidence about the custody battle.

Finally, Podrebarac acknowledged that he was aware Peralta had been "released from the Sheriff's Department" before Glasgow's trial, yet he did not seek any information from the Sheriff's Department as to why Peralta had been relieved of his duties. Podrebarac did not pursue the issue because he did not think Peralta was an integral part of Glasgow's case.

Near the close of the *Van Cleave* hearing, Eckelman told the district court she did not know she needed to prove prejudice. Eckelman thus admitted she did not know about the *Strickland* standard for proving ineffective assistance of counsel. The district court gave the parties more time to file supplemental briefs, but Eckelman did not do so.

The district court denied Glasgow's motion for a new trial. It found, however, that Podrebarac's "failing to follow up with the school superintendent or other possible school witnesses [about S.G.'s broken wrist] fell below the standard of reasonableness." The district court also assumed, without finding, that Podrebarac committed some other errors alleged at the *Van Cleave* hearing. But the district court ruled against Glasgow because he failed to establish prejudice. Because Glasgow did not show a reasonable probability

11

that Podrebarac's deficient performance affected the jury's verdict, the district court denied his claims.

Glasgow filed an amended appeal following the *Van Cleave* hearing. Eckelman moved to withdraw as Glasgow's counsel based on her decision to retire from the practice of law. Glasgow then was appointed appellate counsel, who filed his appellate brief.

Among the claims this court considered on direct appeal were arguments raised at the *Van Cleave* hearing. But ultimately, a panel of this court affirmed Glasgow's conviction and sentence and the district court's order denying Glasgow's *Van Cleave* claims. *State v. Glasgow*, No. 113,155, 2016 WL 4582542, at *18 (Kan. App. 2016) (unpublished opinion) *rev. denied* 306 Kan. 1323 (2017).

*K.S.A. 60-1507 Proceedings*

In August 2018, Glasgow timely filed a K.S.A. 60-1507 motion, arguing each of his attorneys was ineffective based mainly on errors in the State's complaint and the jury instructions. Glasgow focused most his claims on the lack of evidence supporting the jury's finding that he was at least 18 years old when he committed his offense against his daughter. In response, the State moved to summarily dismiss or deny Glasgow's motion. Finding the motion, files, and records conclusively showed Glasgow was not entitled to relief, the district court summarily denied his claims.

Glasgow filed a timely pro se notice of appeal and a motion for appointed counsel. The district court appointed appellate counsel and the parties filed appellate briefs.

*Analysis*

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2020 Supp. 60-1507(b); see Supreme Court Rule 183(g) (2022 Kan. S. Ct. R. at 244).

A district court may summarily deny a 60-1507 motion when the motion, files, and case records conclusively show the petitioner is not entitled to relief. *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018). The district court did so here. Because this court has the same access to the motion, files, and records, we review that decision de novo. *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018).

It is the movant's burden to prove his or her motion warrants an evidentiary hearing and thus avoid summary denial. In doing so, the movant must make more than conclusory arguments and state an evidentiary basis to support their claims, or an evidentiary basis must appear in the record. The motion must set forth a factual background, names of witnesses, or other sources of evidence to demonstrate that the movant is entitled to relief. *Swenson v. State*, 284 Kan. 931, Syl. ¶ 2, 169 P.3d 298 (2007). In deciding whether an evidentiary hearing must be held, the court generally must accept the factual allegations in the motion as true. See *Hogue v. Bruce*, 279 Kan. 848, Syl. ¶ 1, 113 P.3d 234 (2005). The district court must grant an evidentiary hearing when the motion sets forth facts that, if true, would entitle the movant to relief. *Swenson*, 284 Kan. 931, Syl. ¶ 3.

"To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances and (2) prejudice." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019); see *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In considering deficiency, we recognize a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). A defendant alleging ineffective assistance of counsel "'must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record.'" *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 (2011).

I.     *The District Court Considered All of Glasgow's Claims Before Properly Denying His Motion.*

Glasgow first argues that the district court erred in denying his motion without holding an evidentiary hearing because the district court ignored several paragraphs of his motion which alleged facts entitling him to relief. According to Glasgow, the district court must have ignored paragraphs 10(a) through 10(h) of his motion because the district court would have ruled in his favor had it considered them.

But the district court stated in its written order that it considered Glasgow's motion before giving its opinion. And this was the same judge that presided over Glasgow's jury trial and other postconviction proceedings, so it was familiar with the underlying facts and proceedings.

And nothing in paragraphs10(a) through 10(h) of Glasgow's motion shows the district court committed reversible error in summarily denying his claims. Those paragraphs argue that Glasgow's conviction and sentence should be vacated because the

14

State did not state his age in its complaint or prove his age at trial. Relatedly, Glasgow argued that Podrebarac was ineffective for failing to:

- object to the defective complaint;
- object to the jury instructions for failing to notify the jury Glasgow's age needed to be proved beyond a reasonable doubt;
- move for arrest of judgment based on the complaint;
- move for a new trial because the complaint failed to properly notify him of the accusations against him because of the lack of information about his age; and
- move for an acquittal based on the State's alleged failure to prove his age at trial.

Glasgow also alleged that Eckelman's performance was deficient for not moving for an arrest of judgment and for failing to object to the jury instructions. Glasgow also claimed that his appellate counsel was ineffective for failing to argue on appeal that the complaint warranted reversal of his conviction. All of these assertions are based on the failure to assert and prove his age.

In its order denying Glasgow's claims, the district court correctly noted that Glasgow's motion focused almost entirely on his attorneys' handling of the allegedly deficient complaint and the jury instructions. The district court found that Glasgow failed to show evidence of prejudice from either alleged error. The district court compared the facts of Glasgow's case to those in *State v. Brown*, 298 Kan. 1040, 1041-43, 318 P.3d 1005 (2014), and found any instructional error harmless because the jury had sufficient evidence of Glasgow's age to support his conviction and sentence.

Glasgow concedes on appeal that his attorneys cannot be found ineffective based on their failure to move for arrest of judgment because our Supreme Court decided that issue against him in *State v. Morningstar*, 289 Kan. 488, 213 P.3d 1045 (2009). *Morningstar* held that the failure to list a defendant's age in the jury instructions or

complaint does not invalidate that defendant's conviction for rape of a child under 14. 289 Kan. at 494. Glasgow thus fails to allege facts related to his attorneys' handling of the allegedly defective complaint that could prove his conviction should be overturned.

II.     *Glasgow is Not Entitled to Resentencing.*

Glasgow argues, however, that he must be resentenced because *Morningstar* also held that a defendant cannot receive an off-grid Jessica's Law sentence unless the State proves a defendant's age beyond a reasonable doubt.

We first question whether Glasgow may raise this argument for the first time on appeal. Glasgow argues that appellate review is proper for two reasons:  (1) because he raised the basis for this claim—the alleged lack of trial evidence proving his age—in his K.S.A. 60-1507 motion and (2) because the district court's decision not to hold an evidentiary hearing prevented him from developing this claim earlier.

A court may correct an illegal sentence at any time while the defendant is serving the sentence. K.S.A. 2020 Supp. 22-3504(a). And a defendant may challenge a sentence even for the first time on appeal. *State v. Hambright*, 310 Kan. 408, 411, 447 P.3d 972 (2019). This court has reviewed similar claims under a similar procedural posture—see, e.g., *Dulaney v. State*, No. 122,681, 2021 WL 2603089, *3 (Kan. App. 2021) (unpublished opinion)—and we elect to do so here.

We thus reach the merits of Glasgow's complaint that his sentence is illegal. A sentence is illegal under K.S.A. 2020 Supp. 22-3504(c)(1) when:  (1) it is imposed by a court without jurisdiction; (2) it does not conform to the applicable statutory provisions, either in character or the term of punishment; or (3) it is ambiguous about the time and manner in which it is to be served. Whether a sentence is illegal within the meaning of

16

K.S.A. 2020 Supp. 22-3504 is a question of law over which the appellate court has unlimited review. *State v. Sartin*, 310 Kan. 367, 369, 446 P.3d 1068 (2019).

A.       *Age Omitted From Complaint*

Glasgow's argument that his sentence must be vacated because the complaint failed to include his age fails for two reasons. First, that alleged deficiency did not deprive the district court of jurisdiction because a complaint does not confer jurisdiction:

"Charging documents do not bestow or confer subject matter jurisdiction on state courts to adjudicate criminal cases; the Kansas Constitution does. Charging documents need only show that a case has been filed in the correct court, *e.g.*, the district court rather than municipal court; show that the court has territorial jurisdiction over the crime alleged; and allege facts that, if proved beyond a reasonable doubt, would constitute a Kansas crime committed by the defendant." *State v. Dunn*, 304 Kan. 773, 811, 375 P.3d 332 (2016).

Second, our Supreme Court has explained that a complaint is likely adequate even if it omits the defendant's age, because naming the defendant inherently includes the defendant's age:

"The *Reyna* line of Jessica's Law cases challenging, for the first time on appeal, a charging document's omission of the defendant's age of 18 or over at the time of the crime provides a contemporary illustration of how today's rule should relieve analytical tension arising from *Minor* and *Hall*. See *Reyna*, 290 Kan. at 677-78; see also *State v. Holman*, 295 Kan. 116, 151, 284 P.3d 251 (2012). We have recognized in such cases that the charging document did not include an allegation of the defendant's age, an element of the crime, but ultimately ruled that the omission did not prejudice the defendant's rights as long as the evidence presented to the factfinder on that subject was overwhelming or undisputed. See, *e.g.*, *Sellers*, 292 Kan. at 362. Under the rule we announce today, assuming a defendant succeeds in persuading us to reach the merits of the claim despite a

17

lack of preservation in the district court, we would be more likely to hold that there is no charging document sufficiency problem in the first place. A complaint, indictment, or information that names a defendant or otherwise identifies him or her inherently includes his or her age on the date of the alleged offense. No question of adequate notice to the defendant of his or her own age on the given date is logically possible, and the charging document will have served its purpose of providing notice and a fair opportunity to defend. In other words, there would be no error and we would not reach the prejudice or harmlessness question." *Dunn*, 304 Kan. at 813.

We therefore find Glasgow's argument about the State's complaint unpersuasive.

### B.  *Age Omitted From Jury Instructions*

Glasgow's related argument about the district court's jury instructions is similarly unavailing. When a defendant is convicted of an offense to which Jessica's Law applies, the defendant's age is an element that must be submitted to a jury and proved beyond a reasonable doubt. See *State v. Reyna*, 290 Kan. 666, 675-76, 234 P.3d 761 (2010), *overruled on other grounds by Dunn*, 304 Kan. 773; *Morningstar*, 289 Kan. at 494-95. Glasgow is thus correct that under these circumstances, the district court must instruct the jury on the defendant's age. See, e.g., 289 Kan. at 494-95; *State v. Gonzales*, 289 Kan. 351, 369-71, 212 P.3d 215 (2009), *overruled on other grounds by Dunn*, 304 Kan. 773; and *State v. Bello*, 289 Kan. 191, 196-200, 211 P.3d 139 (2009). But the district court did not do so here.

Rather than instruct the jury to consider Glasgow's age as an element of the offense, the district court included Glasgow's age as a special question on the verdict form. But our Supreme Court has held that this is procedural error because the trial court has no statutory authority to use special questions in a criminal case. So the district court erred here.

Still, this error may be harmless. *Brown*, 298 Kan. at 1048-49. This type of instructional error should be found harmless when the appellate record convinces the appellate court that the jury would have found the essential element if it had been asked to do so. 298 Kan. at 1049-50. Here, unlike in *Reyna*, the record shows that the jury did consider the question of the defendant's age. Its answer to the special question showed that the jury determined Glasgow to be age 18 or older at the time of the offense. And the record contains evidence justifying that inference. First, the jury heard unrefuted testimony proving S.G. was 13 years old when the crime occurred, and that Glasgow was her biological father. The jury could reasonably infer that Glasgow was more than 5 years old when S.G. was born and was thus over 18 when the crime occurred. Second, the jury heard testimony of Glasgow's age in the video recording of S.G.'s interview with police. Third, the jury could observe Glasgow during his jury trial and could consider his age at the time. Together, this evidence shows that had the district court properly instructed the jury on Glasgow's age, the jury would still have found Glasgow to be at least 18 years old or older when he committed his offense. So the error is harmless.

Similar cases underscore the correctness of this harmless error rationale. See, e.g., *Brown*, 298 Kan. at 1054 (finding harmlessness based on defendant's trial testimony that he lived in the residence the crime occurred for 19 years before the offense); *Reyna*, 290 Kan. at 681-82 (finding harmless error when defendant testified he was 37 years old at trial and age was uncontested); *State v. Colston*, 290 Kan. 952, 974, 976, 235 P.3d 1234 (2010) (finding harmless error based on adult children's testimony that defendant was their father and was around 20 years older than they), *overruled on other grounds by Dunn*, 304 Kan. 773; *Levy v. State*, No. 120,441, 2019 WL 4892058, at *3-4 (Kan. App. 2019) (unpublished opinion) (finding harmless error when detective testified defendant was 21 when questioned and jury saw defendant affirm date of birth in video of police interview); but see *State v. Holman*, 295 Kan. 116, 151-52, 284 P.3d 251 (2012) (finding error not harmless because the record lacked evidence which jury could use to determine age and remanding for resentencing), *overruled on other grounds by Dunn*, 304 Kan.

773; *Morningstar*, 289 Kan. at 494-95 (same); *Gonzales*, 289 Kan. at 370-711 (same); *Bello*, 289 Kan. at 199-200 (same).

We thus deny Glasgow's request to remand for resentencing.

III.     *Glasgow's Remaining Ineffective Assistance of Counsel Claims are Unpersuasive.*

Glasgow's remaining claims challenge Eckelman's performance as post-conviction counsel and her handling of the *Van Cleave* procedures. Glasgow alleges that Eckelman's performance during and around the *Van Cleave* hearing was deficient because she failed to:

- follow up on a subpoena issued to S.G.'s school about an injury she suffered;
- elicit testimony about K.G.'s custody matters;
- hire an investigator to interview S.G.'s mother; and
- file motions under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) and *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979).

To show ineffective assistance of counsel we rely on the *Strickland* standard, which requires both inadequate performance of counsel and prejudice to the defendant:

> "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984])." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Our Supreme Court has emphasized that when reviewing claims of ineffectiveness, the appellate court must focus on fundamental fairness:

> "'[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding' and 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' *Strickland*, 466 U.S. at 696." *Balbirnie v. State*, 311 Kan. 893, 900, 468 P.3d 334 (2020).

The State concedes that Eckelman's performance fell below an objectively reasonable standard. The record supports that concession and shows that Eckelman admitted she did not know she needed to prove prejudice at the *Van Cleave* hearing. We thus reach the merits of Glasgow's claims, focusing on prejudice, but we ultimately find remand unwarranted.

### A.     *Failure to Follow Up on School Subpoena*

Glasgow first contends that his attorneys should have obtained records from S.G.'s school relating to her injured wrist to show that she had lied about Glasgow having hurt her arm—this would show her lack of credibility and strengthen Glasgow's theory that S.G. was lying about his sexually abusing her. Glasgow unsuccessfully raised this issue on direct appeal as to Podrebarac. Glasgow now argues that Eckelman's failure to present evidence at the K.S.A. 60-1507 hearing other than Podrebarac's testimony caused his claim against Podrebarac to fail on direct appeal.

In deciding the 60-1507 motion, the district court found that although Podrebarac was deficient for not following up on the subpoena issued to S.G.'s school, Glasgow failed to prove prejudice:

"At the *Van Cleave* hearing, the Defendant did not present any witnesses or other evidence to support his position that the victim was a liar or had lied about a broken arm. The Defendant does nothing more than speculate that this evidence was available.... Without evidence, this Court has nothing to show how the Defendant was prejudiced by trial counsel not talking with school personnel. Therefore, the Defendant has failed to meet his burden at this point."

On appeal, this court affirmed the district court's conclusion regarding prejudice, adding the following support for its reasoning:

"Important to this finding is Glasgow's testimony that he never spoke with school officials about this matter. This lack of knowledge, coupled with Glasgow's posttrial failure to provide any school reports or testimony about the incident at school and S.G.'s implicit denial of this allegation during the preliminary hearing, suggests scant support for Glasgow's claim that S.G. lied about a previous incident of physical abuse. The district court did not err in finding that counsel's deficient performance did not prejudice the defense and deprive Glasgow of a fair trial." *Glasgow*, 2016 WL 4582542 at *16.

Glasgow again fails to present evidence of prejudice. Glasgow argues that Eckelman should have presented more evidence on this matter, but he does not state what other evidence may tend to show that S.G. lied about previous physical abuse. Glasgow never spoke to school officials about the matter, and S.G. denied having lied about a broken arm. Without some proffer, we remain unconvinced that any such evidence exists. Glasgow has thus failed to show prejudice from Podrebarac's acts, and resultingly, from Eckelman's acts.

22

B.      *Failure to Present Evidence Regarding Custody Matters*

Second, Glasgow argues that Eckelman should have presented a transcript of the custody hearing in which a district court granted Glasgow's request for custody of K.G. Glasgow also claims that Eckelman should have called, as a witness in Glasgow's criminal case, the judge who presided over that custody matter.

Still, we see no prejudice. The record shows that the jury heard extensive evidence about the custody dispute. The jury knew about the change of custody. And the fact that a judge granted Glasgow's motion to change custody of K.G. does nothing to prove Glasgow did not rape S.G. Thus, Glasgow fails to show a reasonable probability that the jury would have changed its verdict had Eckelman admitted the transcript of the custody hearing or called the judge as a witness. So Glasgow fails to show that this allegedly deficient performance prejudiced the outcome of his criminal case.

C.      *Failure to Hire an Investigator and Interview Mother*

Third, Glasgow argues that Eckelman was ineffective because she failed to present evidence of prejudice caused by Podrebarac's failure to investigate Mother. At the *Van Cleave* hearing, Glasgow testified that Mother had threatened him based on her belief he was involved in K.G.'s allegations of sexual abuse against Stepfather. Podrebarac acknowledged that he knew that K.G. had accused Stepfather of abusing her, but he did not hire an investigator and could not recall whether he had any information about an investigation into those claims. Podrebarac testified at the Van Cleave hearing that he likely did not hire an investigator because he did not believe it would be helpful in Glasgow's defense.

Podrebarac focused his defense strategy on the theory that S.G. had fabricated the rape allegations as a part of a dream. The record shows that Podrebarac attacked S.G.'s

23

credibility based on her lack of awareness when disclosing the incident to Mother, her general dislike of Glasgow, and her potential disdain for the K.G. custody matters.

Our appellate courts do not generally second-guess strategic decisions of counsel or require counsel to make futile arguments. See *Breedlove v. State*, 310 Kan. 56, 64-65, 445 P.3d 1101 (2019) (citing *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 [2013]; *Chamberlain v. State*, 236 Kan. 650, 658, 694 P.2d 468 [1985] [when counsel has no sound basis to believe that pretrial motion would have merit and no basis to make such motion, failure to make it is not ineffective assistance]). In fact, our Supreme Court has long held that strategic decisions are "virtually unchallengeable." *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 (2006). But this principle applies only when an attorney's decisions are based on a thorough investigation of the law and facts. See *Wilson v. State*, 51 Kan. App. 2d 1, 18, 340 P.3d 1213 (2014). "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *State v. Coones*, 301 Kan. 64, 74, 339 P.3d 375 (2014) (quoting *Strickland*, 466 U.S. at 690-91).

In its order denying this argument, the district court explained it was difficult to determine whether counsel's failure to hire an investigator amounted to ineffective assistance of counsel because "once again, the Defendant failed to present any evidence at the Van Cleave hearing as to what an investigator might have discovered or what the victim's mother might have said about a broken arm or any other issues."

On direct appeal, this court found no ineffectiveness and no prejudice. It held that Podrebarac did not perform inadequately because his failure to seek admission of evidence irrelevant and immaterial to the mother's credibility was not ineffective:

24

"Upon our review of this claim, we fail to find either ineffectiveness or prejudice. Assuming Glasgow's testimony was true, there was no evidence to support the notion that [K.G.]'s accusation against [Stepfather] was relevant or material to whether S.G. had falsely accused Glasgow of rape. Moreover, assuming that [Mother] had told Glasgow that she would seek retribution for his reporting of [K.G.]'s abuse, there was no evidence that [Mother] prompted S.G. to make up a false rape account to exact [Mother's] revenge. In short, regardless of Glasgow's report that [Stepfather] had molested [K.G.] 2 years prior to S.G.'s report of rape, without some evidence tying these facts to the commission of the rape charge, this collateral matter was not relevant or material to any issue in controversy at Glasgow's trial.

"We view this particular claim of ineffectiveness as a part of Glasgow's concern that Podrebarac did not sufficiently attack the credibility of S.G. and [Mother]. But our review of the record shows that Podrebarac did challenge the credibility of both S.G. and [Mother]. In particular, Podrebarac established that S.G. preferred [Stepfather] as her dad rather than Glasgow, that prior to the reported rape she did not want to have visitations with Glasgow, and that she was upset that [K.G.] wanted to live with him.

"With regard to attacking [Mother's] credibility, Podrebarac established that [Mother's] relationship with Glasgow was only "so-so;" that while [K.G.] was closer to Glasgow, S.G. was closer to her; and that about the time of the reported rape [Mother] was upset because Glasgow wanted to change legal custody and have S.G. live with him. Evidence produced at the *Van Cleave* hearing also showed that Podrebarac had reviewed the transcript of the child custody hearing involving [K.G.] and the jury had heard testimony regarding the contentious nature of this litigation.

"In summary, we are persuaded that Podrebarac did challenge the credibility of S.G. and [Mother] and developed evidence establishing the ongoing custody dispute which could have prejudiced S.G. and [Mother] against him. Podrebarac's failure to seek admission of evidence irrelevant and immaterial to attacking their credibility was not ineffective. Moreover, even assuming error, given Podrebarac's appropriate challenges to S.G.'s and [Mother's] credibility and the tenuousness of the challenged evidence that Glasgow claims would have undermined their credibility, we are convinced there is no reasonable probability that but for counsel's error the result of the proceeding would have been different. See *Fuller*, 303 Kan. at 486." 2016 WL 4582542, at *16-17."

We do not revisit these findings. Podrebarac acted adequately in determining that additional investigation of Mother was unnecessary. But even assuming error, Glasgow has not shown any prejudice by the failure to investigate—Podrebarac adequately attacked Mother's and S.G.'s credibility. So Eckelman was not ineffective for not showing that Podrebarac's failure to investigate Mother somehow prejudiced Glasgow.

A.      *Failure to File Certain Pretrial Motions*

Lastly, Glasgow argues Eckelman inadequately challenged Podrebarac's failure to move for a *Jackson v. Denno* hearing (to determine the admissibility of his statements to police) and for a *Gregg* evaluation (to perform an independent psychological evaluation of S.G.).

We first examine the lack of a *Jackson v. Denno* motion. A *Jackson v. Denno* hearing decides the voluntariness of a defendant's statement or confession. See *Jackson*, 378 U.S. at 376-77; *State v. Sesmas*, 311 Kan. 267, 272, 459 P.3d 1265 (2020); *State v. Gibson*, 299 Kan. 207, 222, 322 P.3d 389 (2014). The only statement Glasgow challenges in this appeal is his statement to Peralta that he never did anything sexual with his daughters—a statement Peralta claimed Glasgow made before Peralta had confronted Glasgow with S.G.'s allegations. But Glasgow testified at the *Van Cleave* hearing that he was never forced to speak to law enforcement. And he admitted at trial that he had voluntarily spoken with Peralta. Given those admissions, Glasgow would likely not succeed in showing at a *Jackson v. Denno* hearing that his statements were involuntary. But even if he showed the involuntary nature of Glasgow's statements, he fails to show that the exclusion of Glasgow's statement would have led to a different verdict, since his statement was not a confession and other evidence, including S.G.'s statements, supports his conviction.

The second motion Glasgow now targets is a *Gregg* evaluation. In *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979), our Supreme Court held that "a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." In determining whether compelling circumstances exist, a district court considers these, among other, factors:

> "'(1) whether there was corroborating evidence of the complaining witness' version of the facts, (2) whether the complaining witness demonstrates mental instability, (3) whether the complaining witness demonstrates a lack of veracity, (4) whether similar charges by the complaining witness against others are proven to be false, (5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and (6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth.' [Citation omitted.]" *State v. McCune*, 299 Kan. 1216, 1231, 330 P.3d 1107 (2014).

Glasgow has not alleged facts related to S.G.'s "mental instability, lack of veracity, similar charges against other men proven to be false, or any other reason why this particular child should be required to submit to such an examination." *Gregg*, 226 Kan. at 490. Nor has he shown other circumstances compelling a mental examination. So the record lacks evidence suggesting Podrebarac could have succeeded in getting a *Gregg* evaluation of S.G.

Podrebarac testified that he lacked justification to request a *Gregg* evaluation, so he did not move for one. Still, he hired an expert to review S.G.'s forensic interview. That expert found nothing unusual in that interview, supporting Podrebarac's testimony that he lacked justification to request a mental evaluation.

As the State contends, the record shows it unlikely that Glasgow would succeed on either of these motions. Glasgow thus fails to show prejudice, even if we assume that

27

Eckelman inadequately challenged Podrebarac's failure to move for a *Jackson v. Denno* hearing and for a *Gregg* evaluation.

We thus find Glasgow fails to prove prejudice based on these alleged errors.

B.     *Miscellaneous claims*

Glasgow's motion also raises claims against Podrebarac that were already decided by the district court following the *Van Cleave* hearing and by this court on direct appeal. Specifically, Glasgow reasserts that Podrebarac was ineffective for failing to use an expert witness to impeach S.G.'s testimony and for failing to interview "key witnesses." Because those matters have already been resolved, we will not consider them again. See *Glasgow*, 2016 WL 4582542, at *15-17. Nor will we consider mere trial errors that Glasgow raised or could have raised on direct appeal. See Rule 183(c)(3) (2022 S. Ct. R. at 242).

Glasgow's motion alleges that Eckelman was ineffective for not showing that Podrebarac was ineffective by failing to challenge the lack of Glasgow's age in the complaint and in the jury instructions. Glasgow's motion also claims that appellate counsel was ineffective for failing to argue on appeal that the complaint warranted reversal of his conviction. These claims, and others that depend on a finding that the omission of Glasgow's age from the complaint or jury instructions was reversible error, necessarily fail based on the authorities set forth above. Similarly, claims that depend on a finding that Podrebarac was ineffective necessarily fail.

Affirmed.